
DA 06-0278

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 201

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

WILFRED MORRISEY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADC-2002-356
Honorable Thomas M. McKittrick, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Jim Wheelis, Chief Appellate Defender, Joslyn Hunt, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General, Ilka Becker, Assistant
Attorney General, Helena, Montana

            Brant S. Light, Cascade County Attorney, Great Falls, Montana

                Submitted on Briefs:  September 6, 2007

                            Decided:  June 9, 2009

Filed:

           _____
                       Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Wilfred Morrisey appeals from his conviction of deliberate homicide in the Eighth Judicial District Court, Cascade County. We affirm.

## ISSUES

¶2 Morrisey raises four issues on appeal:

1. Did the District Court err in denying Morrisey's motion to suppress statements he made to law enforcement officers and the evidence recovered as a result of those statements?

2. Did the District Court err in denying Morrisey's motion to dismiss for violation of his constitutional right to a speedy trial?

3. Did the District Court err in denying Morrisey's motion for disclosure and allowing Dr. Symes, a forensic anthropologist called by the State as a rebuttal witness, to testify?

4. Was there sufficient evidence upon which a jury could find Morrisey guilty of deliberate homicide beyond a reasonable doubt?

## BACKGROUND

¶3 Nine-year-old Dolana Clark, who lived with her parents in Great Falls, Montana, disappeared the evening of August 2, 1988. Friends and family last saw Dolana riding her sister's bicycle down 25th Street South at around 5:30 p.m. The police conducted an extensive search but were unable to locate her. A year later, a hunter found Dolana's remains in the Little Belt Mountains southeast of Great Falls. Her skull had an entrance wound in back and an exit wound in front caused by a small-caliber bullet.

¶4     Morrissey lived a couple of blocks from the Clark residence and had a close relationship with the family during the years preceding Dolana's disappearance. He ran errands for them, joined them on picnics, and came to holiday dinners. The Clarks used Morrisey's telephone since they did not have one of their own. Dolana spent substantial time at Morrisey's house, and she and her older half-sister, Lisa, occasionally spent the night there. At one point, Morrisey thought about marrying Lisa. He also talked to Dolana about moving in with him once she got older. When Dolana disappeared, Morrisey joined several members of the family in searching for her. About two weeks after her disappearance, however, Morrisey ceased all interactions with the Clark family.

¶5     Morrisey became a suspect in Dolana's disappearance based on his relationship with Dolana, certain inconsistencies in his statements to investigators, and information the police had learned through interviews with other witnesses. Detectives searched Morrisey's house and two vehicles but found no evidence indicating where Dolana might be. They also found no weapons in the house, and Morrisey told them that he did not own any weapons. He repeatedly denied any involvement in what happened to Dolana. Morrisey left Great Falls a few months later and eventually settled in Colorado.

¶6     In 2002, the Great Falls police renewed the investigation into Dolana's death. Detectives reviewed the case file, including statements Morrisey had given back in 1988, and ultimately developed the following theory: Dolana went to Morrisey's house the evening of August 2, 1988, after her father had refused to give her money to purchase a Siamese cat on layaway at a local pet store; Morrisey killed Dolana at some point during the evening and placed her body and bicycle in the trunk of his 1963 Chevy Impala; he

3

then joined family members in searching for Dolana but refused to use either of his vehicles in the search; afterward, he drove her body up to the mountains where it was found a year later; and he then returned to town by roughly 6:30 the morning of August 3.

¶7     The Cascade County Attorney's Office obtained warrants to search Morrisey's residence (which was in a remote location in Weston, Colorado), his Impala, and his 1985 Chevy Camaro. Sergeant John Cameron and Detectives John Schaffer and William Bellusci of the Great Falls Police Department then traveled to Colorado and met with officers from the Las Animas County Sheriff's Office and the Colorado Bureau of Investigation. With these officers' assistance, Cameron, Schaffer, and Bellusci executed the search warrants on September 3, 2002.

¶8     While en route to Morrisey's residence that morning, Sergeant Martinez of the Las Animas County Sheriff's Office noticed Morrisey driving by in the opposite direction in a 1982 Chevy pickup. Martinez initiated a traffic stop, and Cameron advised Morrisey of the search warrants. Cameron asked Morrisey to return with the officers to his residence and provide them access to the house and vehicles. Morrisey complied.

¶9     Once at Morrisey's house, Cameron served him with the search warrants, read him his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), and proceeded with the search, leaving Morrisey with Detectives Schaffer and Bellusci. During the ensuing conversation with the detectives, Morrisey gave a number of incriminating statements. Among other things, he told them that he owned a .22-caliber rifle, which he had broken into several pieces, and that he had thrown parts of the rifle away but had buried the barrel in the mountains behind his house. He also stated that he had done all

4

of this just a couple of weeks earlier after finding out that the police had renewed their investigation into Dolana's death. He explained that he got rid of the gun "because I knew I was going to get pinned with something I didn't do."

¶10    Morrisey directed the detectives to the location where he had buried the rifle barrel. After recovering the barrel, they transported him to the local police station to give a videotaped statement. During the interview, Morrisey admitted that he had lied to detectives in 1988 when he told them that he did not have any weapons. He claimed, however, that he had loaned his rifle to Dolana's father one week before she disappeared and that the rifle was not returned until a week after her disappearance.

¶11    The State charged Morrisey on September 4, 2002, with deliberate homicide, a felony, in violation of § 45-5-102(1)(a), MCA (1987). In May 2004, following a number of continuances and the filing of an amended information, Morrisey filed a motion to suppress his statements to the detectives and any evidence recovered as a result of those statements. The District Court held a hearing, at which Cameron, Schaffer, Bellusci, and Morrisey testified, and thereafter denied the motion. In September 2005, following more continuances, Morrisey filed a motion to dismiss on the ground that his right to a speedy trial had been violated. The District Court held a hearing and thereafter denied that motion as well. The case then proceeded to a four-day jury trial in November 2005. The jury found Morrisey guilty, and the District Court sentenced him to the Montana State Prison for life with no eligibility for parole. Morrisey now appeals.

¶12    Additional facts and procedural background are set forth below as they relate to each issue under consideration.

**DISCUSSION**

¶13 ***ISSUE 1. Did the District Court err in denying Morrisey's motion to suppress statements he made to law enforcement officers and the evidence recovered as a result of those statements?***

## I. Standard of Review

¶14 In reviewing a district court's ruling on a motion to suppress evidence or statements, we determine whether the court's underlying factual findings are clearly erroneous and whether the court's interpretation and application of the law are correct. *State v. Munson*, 2007 MT 222, ¶ 18, 339 Mont. 68, 169 P.3d 364. The court's findings of fact are clearly erroneous if they are not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if this Court's review of the record leaves us with a definite or firm conviction that a mistake has been made. *Munson*, ¶ 18.

## II. Facts and Arguments Related to Morrisey's Motion to Suppress

¶15 As noted, while en route to Morrisey's Colorado residence to execute the search warrants, Sergeant Martinez noticed Morrisey driving by in a pickup in the opposite direction. Martinez, who was driving a marked squad car, turned around and initiated a traffic stop using his overhead lights. Sergeant Cameron and Detective Schaffer were in the squad car with Martinez at the time. Morrisey pulled over, and Martinez (who was in full uniform) instructed Morrisey to exit the vehicle. Cameron and Schaffer (who were in plain clothes but displaying their badges and guns) then approached Morrisey, identified themselves as law enforcement officers from Great Falls, and advised him of the search warrants. Cameron asked Morrisey if he had any weapons, and Morrisey replied that he had a loaded .38-caliber revolver in the pickup. Cameron stated that he would need to

6

secure the weapon and that he would also be taking control of the pickup. Cameron took Morrisey's keys and asked him to return with them to his residence. Morrisey agreed to do so, and the officers then placed him in the caged back seat of Martinez's squad car for transport. Cameron followed in Morrisey's pickup. At no point during his time with the detectives that day was Morrisey advised that he was free to leave.

¶16 Approximately eight to ten law enforcement officers were present at Morrisey's residence to conduct the search of his house and cars. After arriving, Cameron activated a microcassette recorder, served Morrisey with the search warrants, and told him that "[t]his is probably going to take us at least two days." Cameron then read Morrisey his *Miranda* rights. When Cameron first stated, "You have the right to remain silent," Morrisey interjected, "Yeah, I will." Likewise, when Cameron stated, "Anything you say can and will be used against you in a court of law," Morrisey replied, "I ain't saying nothing." Cameron next informed Morrisey: "You have the right to an attorney. One will be appointed to [sic] you prior to any questioning if you desire. If you wish to answer questions now without an attorney, you have the right to stop answering at any time. Do you understand that, Mr. Morrisey?" Morrisey responded, "Yes, got it."

¶17 Following this, the detectives conversed with and questioned Morrisey for the next three to four hours. Morrisey contends that in so doing, the detectives infringed his right to remain silent. In addition, he argues that through "continued prodding" and "improper use of their influence," the detectives "lured" him into speaking with them and that his statements, therefore, were not made voluntarily. Given these arguments, it is necessary to detail relevant portions of the dialogue between Morrisey and the detectives.

7

¶18    After giving the *Miranda* warnings, Cameron informed Morrisey that his house was in the officers' control. Cameron asked Morrisey where the Impala and Camaro were, requested that Morrisey provide the keys to the house and cars, and asked which key opened which door. Cameron then proceeded with the search and left Morrisey with Detectives Schaffer and Bellusci, at which point the following discussion ensued:

Detective[1]: Okay – we sure appreciate your cooperation.
Morrisey: Well, I've got nothing to hide.
Detective: Well that's excellent –
Morrisey: I do have nothing to hide.
Detective: Good. You know why we're here –
Morrisey: I got a feeling.
Detective: Okay –
Morrisey: I got a feeling – yes.
Detective: It's in reference to the Dolana Clark investigation.
Morrisey: I have a feeling. I have nothing to hide.
Detective: And this is one of those –
Morrisey: Lower and raise it – it acts up a little bit, okay? All right. There's the cars in there, all right –
Detective: My job, Bill, is two-fold, okay? I'm assigned to this case and what I want to do is – there's a million that were talked to back in 1988 – about this and you were one of the people that were talked to about that, too –
Morrisey: Yes.
Detective: And we want to get it cleared up – we want to get this case done. Part of my job – is to – try to hold the person responsible who did this.
Morrisey: Yes.
Detective: The other part of my job is to clear those that are not.
Morrisey: All right.
Detective: And that's one of the reasons we're here is to – is to –
Morrisey: Arrest –
Detective: Get this taken care of – hopefully sit down, visit with you and see where we can – see if we can get this resolved.
Morrisey: All right.
Detective: Fair enough?
Morrisey: That is fair. I got no complaints.

---

[1] The transcript does not identify which of the two detectives is speaking.

8

¶19    At this point, the conversation turned to other topics.  In summary, Morrisey stated he wanted to be present in the house during the search, but the detectives would not allow that.  When he expressed concern that an officer might "steal" something, the detectives explained that the officers would be taking photographs first and that any evidence seized would be documented.  Morrisey inquired whether they had "done this" to Dolana's father also, and the detectives told him they were "talking to everybody."  They asked Morrisey whether he had any other loaded weapons, and he responded that he did, noting that there were bears and mountain lions in the area.  He told them about an incident in which a bear had caused damage to his house.  He also informed them that he had a pet cat, which he insisted was not Siamese, noting that he had "a witness to where I got it when I was in Illinois."  He asked them not to let the cat outside.  An officer asked to use the phone, and Morrisey told him there was one in the laundry room.  The detectives and Morrisey also discussed the weather, when he moved to the area, why he had decided to settle in that part of Colorado, whether he was active in church, where he does his banking, how far his property line extended, and why he did not have a computer or Internet access.

¶20    Schaffer and Bellusci then reiterated that they wanted "to sit down and just visit with you and get a formal statement."  They put Morrisey in an unmarked police car and proposed driving to the local sheriff's office, but Morrisey indicated that he would not feel comfortable talking there, so they drove to a local café instead.  On the way there, Morrisey remarked on where he buys his gas and groceries, why he was unmarried, and the experiences he had with the police during the 1988 investigation.  Notably, one of the

9

detectives commented that "it looks to me like you were a bit traumatized by the police before." He told Morrisey, "I want you to relax." They discussed several other topics (an old coal mine they passed on the highway, Morrisey's encounters with bears on his property, the price of gas), and then one of the detectives noted that he had read Morrisey's 1988 statement to the police and felt that Morrisey had been "really protective of folks around you." He asked Morrisey to be "neutral" this time. He also mentioned that the investigators were not going to leave any stone unturned, to which Morrisey replied, "I have nothing to hide." The conversation then returned to other topics.

¶21 Morrisey, Schaffer, and Bellusci arrived at the café, but the conditions there were not conducive to discussing Dolana's homicide. So, they walked to a nearby picnic table, but it began to rain. Thus, they returned to the police car. At the outset of the formal interview, the following exchange occurred:

Detective: Let's get rolling – you know Dolana Clark.
Morrisey: Yes I did know her.
Detective: Okay and you know that we're up here investigating – the homicide of Dolana Clark.
Morrisey: I do know.
Detective: You know that you have been a suspect listed in that case.
Morrisey: Evidently I have been.
Detective: You've been advised of your rights?
Morrisey: Yes.
Detective: Okay and you're willing to talk to us about it.
Morrisey: I will talk.

¶22 During the interrogation, Morrisey stated initially that he did not own a .22-caliber rifle; however, he later admitted that he did own a .22 when he was living in Great Falls, but he claimed that he had "sold it a long time ago" at a flea market in Illinois. Then, after further questioning, he stated that he did not sell the gun, but rather threw it off a

10

bridge into the Mississippi River. Ultimately, however, Morrisey acknowledged that he had the gun until a couple of weeks earlier when he learned through a friend that the police had renewed their investigation into Dolana's death and were asking about small-caliber guns. He explained that he then cleaned and dismantled the rifle, threw parts of it in a trash dumpster, and buried the barrel under some rocks in the mountains behind his house. Morrisey directed the detectives to the location of the barrel. When they further inquired about the other pieces of the rifle, Morrisey stated that "you'll never find them" because he had thrown them "all along the highway." Throughout the interview, Morrisey repeatedly insisted that he did not kill Dolana. He also expressed his belief that Dolana's father had done so.

¶23 In his motion to suppress, Morrisey argued that "the failure of the police to immediately terminate the interview" after he told Cameron "I ain't saying nothing" violated his right to remain silent under *Miranda*, as interpreted in *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321 (1975) (requiring the exclusion of statements obtained during a custodial interrogation if the police did not "scrupulously honor" the suspect's right to cut off questioning). He also argued that the detectives questioned him "relentlessly" and "intimidated" him until they "overcame his resistance" and he "reluctantly" agreed to speak with them. On appeal, Morrisey again contends that under *Mosley*, "the officers should have ceased their interrogation once Cameron first advised Morrisey of his right to remain silent and Morrisey stated that he was not saying anything." He also claims his statements were not made voluntarily, but were the product of "continued prodding" and "improper use" of the detectives' influence and interrogation "techniques."

11

¶24    In response to Morrisey's motion, the State argued that he was not in custody when he made his statements and that, in any event, the detectives were free to continue questioning him because he did not invoke his right to counsel. The State also argued that Morrisey was not subjected to police coercion or intimidation and that it could be "inferred" from his words and actions that he waived his right to be silent and voluntarily answered questions. The State reiterates this argument on appeal. In addition, the State contends that Morrisey did not validly invoke his right to remain silent in the first place, and even if he did, this does not mean that questioning could never be resumed.

### III.  Applicable Law

¶25    Morrisey and the State conflate into one analysis (1) the alleged involuntariness of his statements and (2) the detectives' alleged failure to "scrupulously honor" his right to remain silent. This appears to be due in part to the procedural history of this case. The District Court denied Morrisey's motion to suppress on the ground that he "was not subjected to a custodial interrogation and thus *Miranda* warnings were not required and whether he invoked his *Miranda* rights is moot." But Morrisey then filed a petition for a writ of supervisory control, and in denying that petition we stated that "the real issue is not whether Morrisey was in custody, but whether his post Miranda statements were voluntary." However, with the benefit of a complete record, and in light of the doctrinal distinctions discussed below, it is now clear that Morrisey challenges the admissibility of his statements on two distinct grounds, and it is necessary to analyze those accordingly.

¶26    Prior to *Miranda*, the Supreme Court evaluated the admissibility of a suspect's confession under a voluntariness test that was grounded in the Fifth Amendment's

12

Self-Incrimination Clause ("No person . . . shall be compelled in any criminal case to be a witness against himself.") and the Fourteenth Amendment's Due Process Clause. *See Dickerson v. United States*, 530 U.S. 428, 432-33, 120 S. Ct. 2326, 2330 (2000); *Withrow v. Williams*, 507 U.S. 680, 688, 113 S. Ct. 1745, 1751 (1993); *Missouri v. Seibert*, 542 U.S. 600, 607-08, 124 S. Ct. 2601, 2607 (2004) (plurality opinion). This voluntariness test is based on notions of due process, and the essential inquiry is whether the suspect's will was overborne by the circumstances surrounding the giving of the confession. *Dickerson*, 530 U.S. at 433-34, 120 S. Ct. at 2330-31. A court must examine the totality of all the surrounding circumstances—both the characteristics of the individual and the details of the interrogation—to determine whether the confession was given freely, voluntarily, and without compulsion or inducement of any sort. *See Dickerson*, 530 U.S. at 434, 120 S. Ct. at 2331; *Withrow*, 507 U.S. at 688-89, 693, 113 S. Ct. at 1751, 1754. The Supreme Court has never abandoned this due process/totality-of-the-circumstances test and continues to exclude confessions that were obtained involuntarily. *See Dickerson*, 530 U.S. at 434, 120 S. Ct. at 2331; *Withrow*, 507 U.S. at 689, 113 S. Ct. at 1751; *Miller v. Fenton*, 474 U.S. 104, 109-10, 106 S. Ct. 445, 449 (1985); *see also e.g. Arizona v. Fulminante*, 499 U.S. 279, 286-88, 111 S. Ct. 1246, 1252-53 (1991).

¶27 The Supreme Court's decisions in *Miranda* and *Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489 (1964), however, changed the focus of much of the inquiry in determining the admissibility of a suspect's incriminating statements. *Dickerson*, 530 U.S. at 434, 120 S. Ct. at 2331. First, in *Malloy*, the Court held that the Fifth Amendment's Self-Incrimination Clause is incorporated in the Fourteenth Amendment's Due Process Clause

13

and, thus, applies to the States. *Malloy*, 378 U.S. at 6-11, 84 S. Ct. at 1492-95. Then, two years later in *Miranda*, the Court held that the Fifth Amendment privilege against self-incrimination is available outside of criminal court proceedings and serves to protect persons "in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624. Furthermore, the *Miranda* Court recognized that the modern practice of in-custody interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624. The Court noted that because "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements," *Dickerson*, 530 U.S. at 435, 120 S. Ct. at 2331, the traditional due process/totality-of-the-circumstances test thus posed an "unacceptably great" risk that involuntary custodial confessions would escape detection, *Dickerson*, 530 U.S. at 442, 120 S. Ct. at 2335; *Seibert*, 542 U.S. at 608, 124 S. Ct. at 2608.

¶28    Accordingly, the Supreme Court concluded that "adequate protective devices" are necessary to dispel the compulsion inherent in custodial surroundings and to permit a full opportunity to exercise the privilege against self-incrimination. *Miranda*, 384 U.S. at 458, 467, 86 S. Ct. at 1619, 1624. To that end, the Court laid down the now-familiar "concrete constitutional guidelines" for law enforcement agencies and courts to follow. *Miranda*, 384 U.S. at 442, 86 S. Ct. at 1611; *see also Dickerson*, 530 U.S. at 437-44, 120 S. Ct. at 2332-36 (holding that *Miranda* announced a constitutional rule which cannot be superseded legislatively). When a person "is taken into custody or otherwise deprived of

14

his freedom by the authorities in any significant way and is subjected to questioning," *Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630, he "must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored," *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624. Specifically, he "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630. Moreover, "[o]pportunity to exercise these rights must be afforded to him throughout the interrogation." *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630. Failure to give the warnings and obtain a waiver of rights prior to custodial questioning generally requires exclusion of any statements obtained.[2] *Miranda*, 384 U.S. at 476, 479, 86 S. Ct. at 1629, 1630. Conversely, giving the warnings and getting a waiver generally produces "a virtual ticket of admissibility."[3] *Seibert*, 542 U.S. at 608-09, 124 S. Ct. at 2608.

¶29 In sum, no person may be "compelled" in any criminal case to be a witness against himself or herself. U.S. Const. amend. V. The due process/totality-of-the-circumstances test and the *Miranda* doctrine both serve to protect this privilege. The former asks

---

[2] The Supreme Court has since recognized exceptions to *Miranda*'s exclusionary rule. *See New York v. Quarles*, 467 U.S. 649, 655-59, 104 S. Ct. 2626, 2631-33 (1984) (recognizing a "public safety" exception); *Harris v. New York*, 401 U.S. 222, 224-26, 91 S. Ct. 643, 645-46 (1971) (unwarned but otherwise voluntary statements may be used to impeach a defendant's testimony at trial). Neither of these exceptions has been argued here.

[3] The prosecution has the burden of proving admissibility, including compliance with *Miranda* and the voluntariness of the statements. *Seibert*, 542 U.S. at 608 n. 1, 124 S. Ct. at 2608 n. 1; *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630; § 46-13-301(2), MCA.

whether the suspect's will was overborne by the circumstances surrounding the giving of his or her statements. A statement that was actually coerced must be excluded from trial for all purposes. *See Kansas v. Ventris*, ___ U.S. ___, 129 S. Ct. 1841, 1845 (2009) (citing *New Jersey v. Portash*, 440 U.S. 450, 458-59, 99 S. Ct. 1292, 1296-97 (1979)). Separate and apart from this due process test, the *Miranda* doctrine applies specifically to custodial interrogation and requires that certain procedural safeguards be used in this context. Failure to give the prescribed warnings prior to questioning does not constitute actual coercion; rather, it creates "a bright-line, legal presumption of coercion" which is "irrebuttable for purposes of the prosecution's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 306-07 & n. 1, 105 S. Ct. 1285, 1292 & n. 1 (1985); *accord United States v. Patane*, 542 U.S. 630, 639, 124 S. Ct. 2620, 2627 (2004) (plurality opinion).

¶30     Thus, a custodial statement which may be "voluntary" under traditional due process standards is nevertheless presumed coerced under *Miranda* and is generally inadmissible at trial if law enforcement failed to provide the warnings and obtain a valid waiver of the *Miranda* rights. *See Dickerson*, 530 U.S. at 444, 120 S. Ct. at 2336; *Withrow*, 507 U.S. at 690, 113 S. Ct. at 1752; *Elstad*, 470 U.S. at 304, 105 S. Ct. at 1290; *Miranda*, 384 U.S. at 457, 479, 86 S. Ct. at 1618-19, 1630. In that case, a due process analysis would be unnecessary. Conversely, where there has been no *Miranda* violation or the *Miranda* rule simply does not apply, the defendant may still challenge the admissibility of his statement on due process grounds. *See Dickerson*, 530 U.S. at 444, 120 S. Ct. at 2336; *Elstad*, 470 U.S. at 307-08, 105 S. Ct. at 1292; *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20, 104 S. Ct. 3138, 3147 n. 20 (1984); *New York v. Quarles*, 467

U.S. 649, 655 n. 5, 104 S. Ct. 2626, 2631 n. 5 (1984). Importantly, both the due process/totality-of-the circumstances test and the *Miranda* test apply where the defendant challenges statements made during a custodial interrogation.

¶31 With these distinctions in mind, we first address Morrisey's *Miranda*-based claim, after which we address his due process voluntariness claim.

## IV. Analysis of Morrisey's *Miranda-Mosley* Claim[4]

### A. *Mosley*'s "Scrupulously Honor" Standard

¶32 Morrisey does not contend that the detectives failed to give him the *Miranda* warnings prior to questioning. Rather, he contends that they failed to honor his assertion of his right to remain silent, thus requiring the suppression of his statements. This claim derives from the following passage in *Miranda*:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.

---

[4] In his motion, Morrisey sought to suppress both the statements he made to the detectives and "any evidence recovered as a result of those statements." Yet, in *Patane*, a fragmented Supreme Court held that a *Miranda* violation does not require suppression of the physical fruits of a suspect's unwarned but otherwise voluntary statements. *Patane*, 542 U.S. at 636-37, 124 S. Ct. at 2626 (Opinion of Thomas, J., joined by Rehnquist, C.J., & Scalia, J.); 542 U.S. at 644-45, 124 S. Ct. at 2630-31 (Kennedy & O'Connor, JJ., concurring in the judgment). Several state appellate courts have rejected *Patane* under their respective state constitutions. *See Commonwealth v. Martin*, 827 N.E.2d 198 (Mass. 2005); *State v. Knapp*, 700 N.W.2d 899 (Wis. 2005); *State v. Farris*, 849 N.E.2d 985 (Ohio 2006); *State v. Peterson*, 923 A.2d 585 (Vt. 2007); *State v. Vondehn*, 184 P.3d 567 (Or. App. 2008), *rev. allowed*, 200 P.3d 146 (Or. 2008). However, Morrisey has not made any arguments specific to Article II, Section 25 of the Montana Constitution (which provides that "[n]o person shall be compelled to testify against himself in a criminal proceeding"). Thus, we consider only his statements, and not the physical fruits of those statements; and as we did in *State v. Adkins*, 2009 MT 71, ¶ 27 n. 1, 349 Mont. 444, 204 P.3d 1, we again leave open the question of whether the exclusionary rule applies to physical evidence obtained through an un-Mirandized but otherwise voluntary statement.

At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Miranda*, 384 U.S. at 473-74, 86 S. Ct. at 1627-28 (footnote omitted).

¶33 The Supreme Court interpreted this passage in *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321 (1975). The Court first rejected the notion that the passage requires only the immediate cessation of questioning and permits a resumption of interrogation after a momentary respite. The Court reasoned that "[t]o permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Mosley*, 423 U.S. at 102, 96 S. Ct. at 326. Likewise, the Court rejected the opposite extreme under which a person who has invoked his right to silence can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. The Court reasoned that "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Mosley*, 423 U.S. at 102, 96 S. Ct. at 326.

¶34 The Court instead settled on a middle ground. The critical safeguard identified in the passage at issue, the Court noted, is a person's "right to cut off questioning."

18

Through the exercise of that right, the person can "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley*, 423 U.S. at 103-04, 96 S. Ct. at 326. In turn, the requirement that law enforcement respect a person's exercise of the right to cut off questioning "counteracts the coercive pressures of the custodial setting." *Mosley*, 423 U.S. at 104, 96 S. Ct. at 326. Thus, the Court adopted the following standard: "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' "[5] *Mosley*, 423 U.S. at 104, 96 S. Ct. at 326.

¶35 Before we consider whether the officers satisfied this standard in the present case, we must address two preliminary matters: whether Morrisey was subjected to custodial interrogation and whether Morrisey invoked his right to remain silent.

## B. Custodial Interrogation

¶36 Because the rules articulated in *Miranda* and its progeny protect persons who are subjected to interrogation while in custody, Morrisey cannot invoke *Miranda*'s exclusionary rule unless his statements stemmed from a custodial interrogation. *See Slwooko v. State*, 139 P.3d 593, 602-04 (Alaska App. 2006), and cases cited therein. The State disposes of this question as follows: "For the sake of complying with the word

---

[5] In contrast, if the person asks for an attorney (i.e., invokes his Fifth Amendment right to counsel under *Miranda*), then the interrogation must stop and the person is not subject to further interrogation until counsel has been made available to him (unless the suspect himself initiates further communication with the police). *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1885 (1981); *Montejo v. Louisiana*, ___ U.S. ___, ___ S. Ct. ___, 173 L. Ed. 2d 955, 968 (2009); *see also Arizona v. Roberson*, 486 U.S. 675, 682-85, 108 S. Ct. 2093, 2098-2100 (1988) (holding that the *Edwards* rule is not offense-specific); *State v. Buck*, 2006 MT 81, ¶ 39, 331 Mont. 517, 134 P.3d 53 (noting the distinction between the Fifth Amendment and Sixth Amendment rights to counsel).

limit of the Appellate Rules, the State will not address the issue whether Morrisey was subject to 'custodial interrogation,' although it agrees with the district court's analysis that Morrisey was not 'in custody.' "[6]  Based on our independent review of the record, however, we agree with Morrisey that the statements at issue here were the product of custodial interrogation.  As the District Court noted, there is no dispute that Morrisey was interrogated about Dolana's homicide.  Thus, we focus on the question of custody.

¶37  A person is "in custody" for *Miranda* purposes if he has been deprived of his freedom of action in any significant way or his freedom of action has been curtailed to a degree associated with a formal arrest.  *State v. Munson*, 2007 MT 222, ¶ 21, 339 Mont. 68, 169 P.3d 364.  This determination focuses on whether, given the circumstances surrounding the interrogation, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995); *see also Munson*, ¶ 23 (listing circumstances pertinent to

---

[6] The Montana Rules of Appellate Procedure do not allow for "shortcut tactics" such as this.  *State v. Ferguson*, 2005 MT 343, ¶ 40, 330 Mont. 103, 126 P.3d 463.  The argument section of an appellee's brief must contain legal analysis and citations to relevant authority with respect to the issues presented.  *See* M. R. App. P. 23(b) (2005), *superseded*, M. R. App. P. 12(2) (2007); *see also* M. R. App. P. 23(g)(i) (2005), *superseded*, M. R. App. P. 12(10) (2007) (providing for over-length briefs).  As we have previously stated, "[t]he requirement that appellate briefs 'contain' a party's contentions unquestionably precludes parties from incorporating trial briefs or any other kind of argument into appellate briefs by mere reference.  Simply put, appellate arguments must be contained within the appellate brief, not within some other document."  *Ferguson*, ¶ 41.  The State's approach, moreover, is totally incongruous in light of its position in *State v. Cybulski*, 2009 MT 70, 349 Mont. 429, 204 P.3d 7, where the State argued that "allowing [the appellant] to incorporate trial arguments into appellate briefs by reference seriously undermines the word and page limitations in M. R. App. P. 11(4)" (formerly M. R. App. P. 27(d) (2005)).  *Cybulski*, ¶ 14.  Likewise here, incorporating the District Court's analysis into its appellate brief by reference undermines the very word and page limitations with which the State purports to be complying.

this inquiry). Here, Morrisey was stopped by armed police officers pursuant to a traffic stop in a remote area. The officers took control of his pickup and placed him in the caged back seat of their squad car for transport back to his house. They then took control of his house and his other two vehicles. He was given the *Miranda* warnings which, although not dispositive (*see Munson*, ¶ 23 n. 1), certainly contributes to a reasonable person's understanding that he or she is being held as a criminal suspect. *See People v. Aguilera*, 59 Cal. Rptr. 2d 587, 593 n. 6 (Cal. App. 6th Dist. 1996); *People v. Brown*, 554 N.E.2d 216, 221-22 (Ill. 1990); *see also e.g. State v. Lacey*, 2009 MT 62, ¶ 63, 349 Mont. 371, 204 P.3d 1192. Eight to ten law enforcement officers were present at his residence. He was accompanied by at least two officers at all times (while in the front yard, on the trip to the café, and during the interview). They told him that they "came a long ways to talk to you about [Dolana's homicide]" and wanted to "get a formal statement" then and there because they were "not coming back here." The detectives put Morrisey in another police car and transported him elsewhere for an interview. They became increasingly forceful in their questioning, directing him several times to stay on point and repeatedly challenging the veracity of his answers. It is true that when he objected to doing the interview at the local sheriff's office, they allowed him to choose another location. It is also true that they did not physically restrain him with handcuffs or by use of force. Nevertheless, they controlled his actions while at his house, they took him from his house in a police car for purposes of an interrogation, and they told him that they needed to get a formal statement that day. Morrisey was never advised that he was free to leave; to the contrary, through their statements and conduct, the detectives communicated that he was

21

under their control and would not be let out of their presence until he gave a statement.[7]

In sum, a reasonable person in Morrisey's shoes would not have felt free to terminate the interrogation, get out of the police car, and leave. The totality of the circumstances establishes that he was in custody, having been "deprived of his freedom of action in [a] significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612.

### C. Invocation of the Right to Remain Silent

¶38 The State asserted in the District Court that Morrisey "did not invoke his right to counsel; therefore the police were free to continue questioning him." The issue, however, is whether he invoked his right to remain silent, and the fact that he "did not request an attorney is certainly irrelevant to the question of whether he invoked his right to remain silent." *United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004). Moreover, it does not follow that the police were free to continue questioning Morrisey simply because he did not invoke his right to counsel. If he invoked his right to remain silent, the police were required to cease any interrogation and to "scrupulously honor" his right to cut off questioning. *Mosley*, 423 U.S. at 100, 104, 96 S. Ct. at 325, 326.

¶39 Alternatively, the State argues that Morrisey's invocation of his right to remain silent was invalid because it was ambiguous or equivocal. This standard, which derives

---

[7] At the suppression hearing, Cameron testified that Morrisey "could have left at any time." Schaffer and Bellusci testified to the same effect. However, the detectives acknowledged that not one of them communicated this fact to Morrisey, and it is well-settled that "an officer's undisclosed view that the individual may (or may not) terminate the interview and leave has no bearing on the question whether the individual was in custody at the time." *Munson*, ¶ 21; *accord Evans v. District Court*, 2000 MT 38, ¶ 21, 298 Mont. 279, 995 P.2d 455. "Custody" depends on objective circumstances, not on the subjective and undisclosed views harbored by the officers. *Stansbury v. California*, 511 U.S. 318, 323-24, 114 S. Ct. 1526, 1529-30 (1994) (per curiam).

22

from *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994), applies to a post-waiver invocation of the *Miranda* right to counsel (i.e., an invocation after having initially waived that right), and the Supreme Court has not yet directly addressed whether it applies to the right to remain silent, let alone a pre-waiver invocation of that right. *See DeWeaver v. Runnels*, 556 F.3d 995, 1000-01 & n. 1 (9th Cir. 2009) (noting that an ambiguous pre-waiver assertion might require a different analysis); *State v. Leyva*, 951 P.2d 738, 743 (Utah 1997) (refusing to extend *Davis* to pre-waiver scenarios). But even assuming, arguendo, that a person in custody must articulate his pre-waiver desire not to answer questions "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be" an assertion of the right to remain silent, *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355, we conclude that Morrisey did so.

¶40     "[A] suspect need not 'speak with the discrimination of an Oxford don.' " *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355. Nor need he "rely on talismanic phrases or any special combination of words to invoke his Fifth Amendment right to remain silent." *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996); *accord McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir. 2001). Laypeople are not learned in constitutional principle or legal nicety, and to require that precise words be uttered would elevate form over substance. *State v. Spang*, 2002 MT 120, ¶ 23, 310 Mont. 52, 48 P.3d 727, *overruled in part on other grounds*, *State v. Buck*, 2006 MT 81, ¶ 48, 331 Mont. 517, 134 P.3d 53. Whether the suspect invoked his *Miranda* rights is an objective inquiry. *See Davis*, 512 U.S. at 458-59, 114 S. Ct. at 2355. Here, when Cameron told Morrisey, "You have the right to remain silent," Morrisey responded, "Yeah, I will." And when Cameron stated,

23

"Anything you say can and will be used against you in a court of law," Morrisey asserted, "I ain't saying nothing." Taken together, we find nothing ambiguous or equivocal about these responses. *Cf. State v. Szpyrka*, 202 P.3d 524, ¶ 5 (Ariz. App. 2d Div. 2008) (finding no meaningful difference between the defendant's statement "I got nothin' to say" and the locution "I wish to remain silent"); *People v. Carey*, 227 Cal. Rptr. 813, 814-15 (Cal. App. 2d Dist. 1986) ("I ain't got nothin' to say" was sufficient to invoke the right to remain silent); *Cuervo v. State*, 967 So.2d 155, 163 (Fla. 2007) ("No quiero declarar nada," or "I don't want to declare anything," constituted a clear invocation of the right to remain silent); *State v. Crump*, 834 S.W.2d 265, 269-70 (Tenn. 1992) ("I don't have anything to say" was sufficient to invoke the right to remain silent).

¶41 The State notes Morrisey's subsequent statements to the detectives and contends that his remarks could not have been interpreted to mean that he was unwilling to talk. But a suspect's post-request responses to further questioning "may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 495 (1984) (per curiam). We conclude that a reasonable police officer in the circumstances would have understood Morrisey's initial statements to be an assertion of his right to remain silent.[8]

---

[8] To the extent the detectives found Morrisey's statements to be ambiguous or equivocal, it is "good police practice" in such situations for the interviewing officers to clarify whether or not the suspect is actually invoking his *Miranda* rights. *See Davis*, 512 U.S. at 461, 114 S. Ct. at 2356; *Simmons v. Bowersox*, 235 F.3d 1124, 1132 n. 3 (8th Cir. 2001); *see also e.g. State v. Maestas*, 2006 MT 101, ¶ 18, 332 Mont. 140, 136 P.3d 514. Clarifying questions help protect the rights of the suspect and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement. *Davis*, 512 U.S. at 461, 114 S. Ct. at 2356.

## D. Application of the "Scrupulously Honor" Standard

¶42    Having concluded that Morrisey was subjected to custodial interrogation and invoked his right to remain silent, we now address whether that right was infringed thus requiring the suppression of his statements. The central question is whether his right to cut off questioning was "scrupulously honored." *Mosley*, 423 U.S. at 104, 96 S. Ct. at 326. The *Mosley* Court did not announce a bright-line rule for determining whether the police satisfied this standard, but the Court did indicate that "refusing to discontinue the interrogation upon request" or "persisting in repeated efforts to wear down [the person's] resistance and make him change his mind" would violate the "scrupulously honor" requirement. *See Mosley*, 423 U.S. at 105-06, 96 S. Ct. at 327. Short of such conduct, the determination depends on surrounding circumstances, such as the amount of time that elapsed between the assertion of the right to remain silent and the resumption of questioning, whether the person was given a fresh set of *Miranda* warnings and a full and fair opportunity to exercise his rights, whether the second interrogation concerned the same crime that the person previously declined to discuss, and the intensity with which the police pursued questioning after the suspect asserted the right to silence. *See Mosley*, 423 U.S. at 104-06, 96 S. Ct. at 326-27; *United States v. Barone*, 968 F.2d 1378, 1383-84 (1st Cir. 1992). Unlike the traditional voluntariness test, where the suspect's state of mind is central (*see* ¶ 26, *supra*), the *Mosley* test focuses on "what the police did, and when," after the suspect exercised the right to remain silent. *Barone*, 968 F.2d at 1384.

¶43    The present case does not involve a refusal by the police to discontinue an interrogation upon request. First, when Morrisey first asserted his right to remain silent,

there was no interrogation in progress. Then, at the outset of the formal interview, he told the detectives that he was willing to talk to them about Dolana's homicide; and at no point thereafter did he ask that questioning be terminated. Morrisey points out that in the interim between his assertion of the right to remain silent and the start of the formal interview, the detectives conversed with him about a variety of topics (*see* ¶¶ 18-20, *supra*), which in Morrisey's view violated *Mosley*. However, none of the detectives' questions and comments constituted interrogation. "Interrogation," as conceptualized in *Miranda*, "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S. Ct. 1682, 1689 (1980). A definition that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself. *United States v. Foster*, 227 F.3d 1096, 1102-03 (9th Cir. 2000). Thus, the Supreme Court has stated that "interrogation" under *Miranda* extends only to "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301-02, 100 S. Ct. at 1689-90 (footnote omitted). Here, Cameron asked Morrisey a few questions related to the search and then left Morrisey with Schaffer and Bellusci, who in turn informed Morrisey why they were there and told him that they wanted to sit down with him and discuss Dolana's homicide. Morrisey responded, "That is fair. I got no complaints." He also stated several times, "I have nothing to hide." From that point forward until the formal interview began, the three of them conversed about numerous topics which had nothing to do with the investigation. Although the conversation did

touch on the investigation a few times, we cannot agree that the detectives should have known that their questions and comments were reasonably likely to elicit incriminating responses. Indeed, no incriminating response was elicited during this period.

¶44 This also is not a case in which the police persisted in repeated efforts to wear down the suspect's resistance and make him change his mind about remaining silent. To the contrary, the transcript of the conversation preceding the formal interview shows that Morrisey changed his mind of his own volition. With little or no prompting at all, he freely conversed with the detectives about the weather, the surrounding landscape, his pet cat, his guns, the price of gas, his relationship with his mother, his experiences with bears in the area, where he does his banking, where he buys his gas and groceries, why he decided to settle in that part of Colorado, why he was unmarried, and why he did not have a computer or Internet access. Morrisey was hardly opposed to speaking; if anything, he was loquacious. Furthermore, at the outset of the formal interview, the detectives reminded him that he had been advised of his rights, they asked him whether he was willing to talk to them about the homicide, and Morrisey stated, "I will talk."

¶45 Morrisey points out that not long after he asserted his right to remain silent, the detectives told him that "we want to get it cleared up – we want to get this case done" and "hopefully sit down, visit with you and see where we can – see if we can get this resolved." In isolation, these statements could be viewed as an attempt to undermine Morrisey's resolve to remain silent. But by that point, he had already stated several times that he had nothing to hide; and when read in context, the detectives' remarks were not part of an effort to induce Morrisey to talk when he otherwise would not do so.

¶46  In sum, the critical safeguard at issue is Morrisey's right to cut off questioning and thus control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation, thereby counteracting the coercive pressures of the custodial setting. *Mosley*, 423 U.S. at 103-04, 96 S. Ct. at 326. The record before us does not support the conclusion that this right was infringed. We hold, therefore, that Morrisey was not entitled to suppression of his statements under his *Miranda-Mosley* theory.

### V.  Analysis of Morrisey's Due Process/Totality-of-the-Circumstances Claim

¶47  As noted, the essential inquiry under the due process voluntariness test is whether the suspect's will was overborne by the circumstances surrounding the giving of the confession. *Dickerson*, 530 U.S. at 433-34, 120 S. Ct. at 2330-31. A court must examine the totality of all the surrounding circumstances, including the characteristics of the individual and the details of the interrogation, to determine whether the confession was given freely, voluntarily, and without compulsion or inducement of any sort. *See Dickerson*, 530 U.S. at 434, 120 S. Ct. at 2331; *Withrow*, 507 U.S. at 688-89, 113 S. Ct. at 1751. Various factors may be relevant to this inquiry, including: the defendant's age, maturity, education, physical condition, and mental health; the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties; the defendant's background and experience, including any prior experience with the criminal justice system and police interrogation; the length, mood, location, and continuity of the questioning; the use of threats, violence, or physical punishment (such as the deprivation of food or sleep); the exertion of improper influence, psychological coercion, deception, or implied or express promises; and whether the police advised the defendant of his or

28

her rights to remain silent and to have counsel present during custodial interrogation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047 (1973); *Withrow*, 507 U.S. at 693-94, 113 S. Ct. at 1754; *State v. Honey*, 2005 MT 107, ¶ 21, 327 Mont. 49, 112 P.3d 983; *State v. Bieber*, 2007 MT 262, ¶ 31, 339 Mont. 309, 170 P.3d 444.

¶48    Morrisey insists that his statements were not made voluntarily. He points out that at the time he was interrogated, he was over 60 years old and had no prior experience with the criminal justice system or police interrogation. He contends that the detectives disregarded his invocation of his right to remain silent, and through "continued prodding" they "lured" and "guilted" him into talking. We are not persuaded. Although Morrisey initially asserted his right to remain silent, the detectives did not attempt to wear down his resistance and make him change his mind. He decided of his own volition to speak with them. Indeed, when he was first asked whether he was willing to talk about Dolana's homicide, he stated, "That is fair. I got no complaints." And when he was asked the same question later, he stated, without hesitation, "I will talk." The length and continuity of the interrogation (roughly three hours during the afternoon, followed closely by two or three hours in the evening) weigh in Morrisey's favor, as does the fact that the detectives became increasingly forceful in their questioning. However, the detectives did not use threats, violence, or physical punishment. Nor did they use trickery or "good cop/bad cop" tactics. Morrisey was not deprived of sleep, refreshment, bathroom breaks, or physical comfort. In fact, the detectives tried to accommodate him when he said he would not feel comfortable talking at the local sheriff's office. In sum, the record does not support the conclusion that Morrisey's will was overborne by the circumstances. If

29

anything, the totality of the circumstances demonstrates that Morrisey willingly engaged in a running conversation with the detectives. In short, the record reflects that his statements were not "compelled," but rather were given freely and voluntarily.

## VI. Conclusion

¶49 For the foregoing reasons, the District Court correctly denied Morrisey's motion to suppress, albeit for the wrong reasons. Nevertheless, we will affirm a district court's decision when it reaches the correct result for the wrong reasons. *State v. Howard*, 2008 MT 173, ¶ 20, 343 Mont. 378, 184 P.3d 344.

¶50 ***ISSUE 2. Did the District Court err in denying Morrisey's motion to dismiss for violation of his constitutional right to a speedy trial?***

## I. Analytical Framework and Standard of Review

¶51 We analyze a speedy trial claim pursuant to the four-factor balancing test set out in *State v. Ariegwe*, 2007 MT 204, 338 Mont. 442, 167 P.3d 815. We examine the length of the delay, the reasons for the delay, the accused's responses to the delay, and any prejudice to the accused and then balance these four factors with any other relevant circumstances to determine whether the right to a speedy trial has been violated. *Ariegwe*, ¶¶ 106-112; *State v. Billman*, 2008 MT 326, ¶ 11, 346 Mont. 118, 194 P.3d 58.

¶52 Whether a defendant has been denied the right to a speedy trial presents a question of constitutional law. *Billman*, ¶ 8. This Court reviews de novo a district court's legal conclusions to determine whether the court correctly interpreted and applied the law. *Billman*, ¶ 8. But we review the factual findings underlying the court's speedy trial ruling to determine whether those findings are clearly erroneous. *Ariegwe*, ¶ 119.

30

## II. Analysis[9]

### A. Factor One: The Length of the Delay

¶53 The State charged Morrisey on September 4, 2002, with deliberate homicide and tampering with evidence (the latter charge was dismissed on the last day of trial); however, he was arrested in relation to those charges on September 3, 2002. His trial commenced on November 14, 2005. This constitutes a quite significant delay of 1,168 days between accusation and trial. This delay is considerably greater than the 278-day delay in *Billman*, the 408-day delay in *Ariegwe*, and the 507-day delay in *State v. Rose*, 2009 MT 4, 348 Mont. 291, 202 P.3d 749. Thus, the State has a heavy burden to justify the delay and to show that Morrisey was not prejudiced. *See Ariegwe*, ¶¶ 62, 123; *Billman*, ¶ 18; *Rose*, ¶ 46. Still, while the length of the delay here is substantial, it is but one factor in the analysis. Indeed, whereas the 278-day delay in *Billman* amounted to a speedy trial violation, the 408-day delay in *Ariegwe* and the 507-day delay in *Rose* did not. *See Billman*, ¶ 52; *Ariegwe*, ¶ 155; *Rose*, ¶¶ 88-92. This is because the speedy trial right is "necessarily relative" and "depend[ent] upon circumstances." *Barker v. Wingo*, 407 U.S. 514, 522, 92 S. Ct. 2182, 2188 (1972) (internal quotation marks omitted).

---

[9] Morrisey's motion to dismiss was based on the pre- and post-accusation delay in bringing him to trial. The right to a speedy trial applies to one who has been "accused" of a criminal offense and thus does not protect against pre-accusation delay. *See* Mont. Const. art. II, § 24; U.S. Const. amend. VI; *United States v. Marion*, 404 U.S. 307, 313-15, 92 S. Ct. 455, 459-60 (1971). Rather, pre-accusation delay is addressed by the Due Process Clause or an applicable statute of limitations. *See United States v. Lovasco*, 431 U.S. 783, 788-89, 97 S. Ct. 2044, 2048 (1977); *State v. Krinitt*, 251 Mont. 28, 32-36, 823 P.2d 848, 851-53 (1991). While Morrisey asserted a due process claim related to the pre-accusation delay in this case, which the District Court denied, he does not argue that claim on appeal. We accordingly will consider only his speedy trial claim, and we note that the record before us is sufficient for analyzing that claim. *Cf. Ariegwe*, ¶ 120.

## B. Factor Two: The Reasons for the Delay

¶54    Under Factor Two, we identify each period of delay, attribute the delay to the appropriate party, and assign weight to each period based on the specific cause and motive for the delay. *Billman*, ¶ 20; *Ariegwe*, ¶¶ 63-67.  Delay is charged to the State unless the accused caused the delay or affirmatively waived the speedy trial right for that period. *Billman*, ¶ 20; *Ariegwe*, ¶ 65.

¶55    *First Trial Setting*:  February 18, 2003, which constitutes a 168-day delay from the date of accusation (i.e., from Morrisey's arrest).  The District Court selected this trial date at Morrisey's December 12, 2002 arraignment, which we note was the court's earliest feasible opportunity for doing so.  However, the arraignment was originally scheduled for November 21, 2002, and was continued on motion of defense counsel who was scheduled to be out of town on personal matters.  According to the motion, Morrisey waived his speedy trial right with respect to this continuance.  Thus, of the 168 days, we attribute the period of November 21 to December 12 (21 days) to Morrisey,[10] and we attribute the balance (147 days) to the State as institutional delay. *See Billman*, ¶ 22; *Ariegwe*, ¶ 125.

¶56    *Second Trial Setting*:  May 12, 2003 (an additional 83 days of delay).  Morrisey requested a continuance, explaining that by virtue of the "complexity" of this case, the February 18 trial date was unrealistic.  He noted that the incident giving rise to the

---

[10] Delay caused by defense counsel is charged against the defendant. *Vermont v. Brillon*, ___ U.S. ___, 129 S. Ct. 1283, 1290-91 (2009).  But this rule is not absolute. *Brillon*, 129 S. Ct. at 1292.  For example, "[d]elay resulting from a systemic breakdown in the public defender system could be charged to the State." *Brillon*, 129 S. Ct. at 1292 (citation and internal quotation marks omitted).  Likewise, a defendant can preserve his speedy trial right if he expressly asserts that right and his actions contradict those of his counsel. *See McNeely v. Blanas*, 336 F.3d 822, 829 n. 8 (9th Cir. 2003).

homicide charge had occurred over 14 years earlier and that he needed additional time to investigate, locate potential witnesses, and complete discovery. He stated that he was waiving his speedy trial right with respect to this continuance. We thus attribute the 83 days to Morrisey as legitimate delay related to preparing his defense.

¶57 *Third Trial Setting*: July 28, 2003 (77 days). This postponement was also at Morrisey's request because additional time was needed to prepare his defense. The delay is likewise attributable to Morrisey.

¶58 *Fourth Trial Setting*: September 8, 2003 (42 days). Again, Morrisey filed a motion to continue because he needed additional time to locate and interview potential witnesses, because he was still waiting on certain discovery from the prosecution, and because he was waiting for the reports on evidence that the State had sent to the State Crime Lab for analysis. Given these reasons, responsibility for the 42-day delay is shared equally by Morrisey and the State.

¶59 *Fifth Trial Setting*: December 1, 2003 (84 days). Morrisey filed a motion to continue, citing the same reasons articulated in his previous motion. The State filed a response, stating that it did not oppose a continuance and noting that it was waiting for DNA results from the State Crime Lab. The State also asserted that it had provided Morrisey with all discovery currently in its possession. Responsibility for the 84-day delay is thus shared equally by Morrisey and the State.

¶60 *Sixth Trial Setting*: May 17, 2004 (168 days). Morrisey requested a continuance, again citing "the complexity of this case, the quantity and nature of the evidence and the significant number of witnesses." He also noted that he was still waiting on reports from

the State Crime Lab. The State filed a response, stating that it did not object to a continuance and requesting that the court not set trial during January 2004 due to other homicide trials the County Attorney's Office would be prosecuting that month. This delay is therefore attributable to both Morrisey and the State.

¶61 *Seventh Trial Setting*: August 23, 2004 (98 days). Morrisey requested a 90- to 120-day continuance because he was still trying to locate and interview potential defense witnesses and because the State had endorsed over 100 witnesses, many of whom still needed to be interviewed. Defense counsel stated in the motion that he had proceeded with due diligence in preparing the case but that additional time and funds were needed to complete his investigation. He also noted that the State had recently filed an amended information adding an alternative charge of deliberate homicide by accountability. The State filed a response, stating that it did not object to a continuance and requesting that trial be set for August 2004. Morrisey waived his speedy trial right with respect to this continuance; thus, we attribute these 98 days to him.

¶62 *Eighth Trial Setting*: November 1, 2004 (70 days). Morrisey and the State filed a joint stipulation on August 17, 2004. They noted that the trial needed to be continued because the District Court was presently in the midst of a lengthy civil trial (*Sunburst School Dist. No. 2 v. Texaco, Inc.*). They stipulated to reset trial for November 1, 2004. This delay is attributable to the State as institutional delay related to the court's docket.

¶63 *Ninth Trial Setting*: April 4, 2005 (154 days). Morrisey requested a continuance, noting that the State had recently exhumed Dolana's remains to have them scientifically tested. Morrisey stated that he would be obtaining independent testing and that he

34

needed time to consult with his experts and interview the State's experts. In addition, he noted that his petition for a writ of supervisory control (related to the denial of his motion to suppress) was pending before this Court. Morrisey stated that he was waiving his speedy trial right with respect to this continuance. We thus attribute the delay to him.

¶64 *Tenth Trial Setting*: October 17, 2005 (196 days). On March 18, 2005, Morrisey and the State filed a joint Stipulation to Continue Trial. The forensic anthropologist retained by Morrisey had just recently completed his examination of Dolana's remains, and the State intended to have his opinions and conclusions reviewed by its own expert. The parties stated that they would "provide the Court with a joint recommendation as to a proposed resetting of the trial." Thus, the District Court vacated the April 4 trial date. Yet, by August the court had not heard anything from the parties and was understandably concerned about the mounting delay without a pending trial date. *See Ariegwe*, ¶ 72 ("[T]he primary burden to assure that cases are brought to trial is on the courts and the prosecutors." (internal quotation marks omitted)). The court accordingly ordered the parties to appear for a status hearing. At the hearing, the State explained that it was waiting on a report from its expert. The court, however, noted that Morrisey had been incarcerated since September 2002; and while recognizing that forensic examinations had been ongoing, the court said that it was "not willing to let this case drag on indefinitely." The court thus inquired about the parties' availability and then set trial. Given these circumstances, the 196-day delay is attributable to both Morrisey and the State.

¶65 *Eleventh (and Final) Trial Setting*: November 14, 2005 (28 days). The State filed a motion to continue, attaching a joint stipulation by Morrisey and the State. Morrisey

had to undergo cataract surgery and was not expected to recover in time for trial on October 17. The State asked that the continuance be charged to Morrisey, and the District Court did so. We agree and, thus, attribute the 28 days to Morrisey.

¶66 *Summary*: Unquestionably, the delay of 1,168 days in bringing Morrisey to trial was substantial; however, the parties share equal responsibility for 490 days (42%), and Morrisey waived another 356 days (30%). That leaves 322 days (28%), which were attributable to Morrisey's requests for additional time to prepare his defense, to his cataract surgery, and to institutional circumstances beyond his and the State's control (e.g., the District Court's docket and the time needed to process evidence at the State Crime Lab). Significantly, there is no evidence of any dilatory tactics, purposeful foot-dragging, negligence, or bad-faith delay on the part of the prosecution. To the contrary, the delay here was due largely to the "complexity" of the case and the parties' need for additional time to investigate and prepare for a trial that was based on events which had occurred over 14 years earlier. We conclude, therefore, that Factor Two weighs heavily against finding a violation of Morrisey's right to a speedy trial.

### C. Factor Three: The Accused's Responses to the Delay

¶67 Under the third speedy trial factor, we evaluate the accused's responses to the delay, i.e., his or her acquiescence in and objections to pretrial delays. *Ariegwe*, ¶ 110. The totality of the accused's responses to the pretrial delays is indicative of whether he or she actually wanted a speedy trial. *Billman*, ¶ 31; *Ariegwe*, ¶ 79. Here, the record reflects that Morrisey wanted to proceed to trial as expeditiously as possible and that he only requested continuances in order to conduct the necessary investigations, to prepare

his defense, and to address a medical emergency (prior to the cataract surgery, Morrisey was almost blind).  We also note that Morrisey filed a timely motion asserting his right to a speedy trial.  Accordingly, Factor Three weighs in Morrisey's favor.

## D.  Factor Four: Prejudice to the Accused

¶68    Lastly, under Factor Four, we consider whether the pretrial delay prejudiced the accused in light of the interests that the speedy trial right protects:  (i) preventing oppressive pretrial incarceration, (ii) minimizing anxiety and concern caused by the presence of unresolved criminal charges, and (iii) limiting the possibility that the accused's ability to present an effective defense will be impaired.  *Ariegwe*, ¶ 111.  We have long recognized these three interests as relevant to the analysis of prejudice.  *See e.g. City of Billings v. Bruce*, 1998 MT 186, ¶ 68, 290 Mont. 148, 965 P.2d 866; *State v. Keller*, 170 Mont. 372, 380-81, 553 P.2d 1013, 1018-19 (1976).  As noted (*see* ¶ 53, *supra*), the State has a heavy burden to show that Morrisey was not prejudiced, given the substantial delay of 1,168 days in this case.

¶69    The District Court determined that Morrisey had been subjected to oppressive pretrial incarceration, having been incarcerated on unproven charges for over three years.  *Cf. Ariegwe*, ¶ 90 ("[T]he longer the pretrial incarceration, the more likely it has been oppressive and the more likely the accused has been prejudiced by the delay.").  Next, the court determined that the delay in bringing Morrisey to trial had not aggravated the anxiety and concern inherent in being accused of a crime.  The court noted that Morrisey had never moved the court for a reduction of his bail.  Lastly, the court determined that Morrisey's ability to present an effective defense had not been impaired.  In this regard,

Morrisey's position was that he suffered prejudice because certain witnesses either had died or could not be located. He also claimed that some of his witnesses had difficulty recalling the events in question after so many years. But the District Court observed that Morrisey had not subpoenaed a single witness for any of the previous trial dates and that he had offered nothing more than speculation as to what testimony the unlocated or deceased witnesses would have provided.

¶70 On appeal, the parties focus on the impairment issue and present no arguments related to the first two speedy trial interests (oppressive pretrial incarceration, and anxiety and concern). Morrisey again claims that the pretrial delay impaired his ability to present an effective defense. He contends that one of the other suspects in Dolana's death committed suicide in July 2004 "before Morrisey could interview him." As the State points out, however, Morrisey had "ample time" to interview this witness prior to his death. Morrisey also contends that he was unable to locate a witness named Soloria who (according to Morrisey) told the police that she saw Dolana hiding and jumping out of a truck on the day she disappeared. Morrisey asserts that Soloria's testimony "would have established . . . that Morrisey was not involved in her disappearance since he did not own a truck." But, as the State points out, Morrisey does not explain how Soloria's unavailability was due to the pretrial delay in this case.

¶71 We agree with Morrisey that time may erode the accuracy of witness testimony and exculpatory evidence, thereby impairing the defendant's ability to present an effective defense. *Ariegwe*, ¶ 98. We also agree that impairment of one's defense is the most difficult form of speedy trial prejudice to prove, since time's erosion of exculpatory

evidence and testimony can rarely be shown. *Ariegwe*, ¶ 99. But the period at issue here is the time between accusation and trial, not the time between Dolana's disappearance and trial (*see* footnote 9, *supra*), and Morrisey fails to explain how the delay between his arrest in September 2002 and his trial in November 2005 impaired his ability to present an effective defense. As discussed under Factor Two, a substantial portion of the delay was requested by Morrisey for the express purpose of conducting investigations, having evidence tested, locating and interviewing potential witnesses, and preparing his defense to the charges. If anything, therefore, the record suggests that Morrisey's ability to prepare his defense was benefited, not prejudiced, by the continuances in his trial.

¶72 We conclude that, notwithstanding the presumption of prejudice in this case (*see* ¶ 53, *supra*; *Ariegwe*, ¶ 49), Factor Four does not weigh significantly in Morrisey's favor. Although the pretrial incarceration was oppressive in terms of duration, Morrisey has not demonstrated aggravated anxiety and concern or an impaired ability to present an effective defense as a consequence of the delay.

### E. Balancing

¶73 We last determine whether Morrisey was deprived of his right to a speedy trial in light of the facts of the case and the weight assigned to each of the four factors discussed above. *Rose*, ¶ 87. "None of the factors is dispositive by itself; rather, the factors are related and must be considered together with such other circumstances as may be relevant." *Ariegwe*, ¶ 153. Moreover, each factor's significance depends on the unique facts and circumstances of the case. *Ariegwe*, ¶ 105; *Billman*, ¶ 11. Here, on one hand, the pretrial delay was substantial and Morrisey wanted to proceed to trial as expeditiously

39

as possible. But, on the other hand, he requested or waived much of the delay so that he could properly prepare his defense, and there is no evidence of negligence or bad-faith delaying tactics on the part of the prosecution. Given these latter considerations and the lack of significant prejudice caused by the delay, we conclude that Morrisey was not denied his right to a speedy trial.

¶74 ***ISSUE 3. Did the District Court err in denying Morrisey's motion for disclosure and allowing Dr. Symes, a forensic anthropologist called by the State as a rebuttal witness, to testify?***

### I. Standard of Review

¶75 The interpretation and construction of a statute is a matter of law which we review de novo to determine whether the district court interpreted and applied the statute correctly. *State v. Triplett*, 2008 MT 360, ¶ 13, 346 Mont. 383, 195 P.3d 819.

### II. Background

¶76 Prior to trial, Morrisey filed a motion for disclosure under § 46-15-322, MCA, asking the State to produce the curriculum vitae and other qualifications of its witness Dr. Symes, a forensic anthropologist who examined Dolana's skull. Morrisey also sought disclosure of Dr. Symes' "conclusion(s) or opinion(s) herein; the basis and/or reasoning and/or methodology of or for said conclusions or opinions; the results of any tests conducted; [and] a copy or any report of his opinion(s), conclusion(s)." In response, the State asserted that such disclosure was not required because (1) the State did not intend to call Dr. Symes in its case-in-chief, but rather would call him only "as a rebuttal witness to rebut the testimony of" Dr. Gill-King, a forensic anthropologist retained by Morrisey, and (2) the State would call Dr. Symes only "to impeach the credibility" of Dr. Gill-King.

40

Morrissey, however, pointed out that the State had never indicated before then that Dr. Symes would be called only for rebuttal purposes. He noted that six months earlier, the parties had filed a joint Stipulation to Continue Trial in which the State explained that Dr. Symes would be reviewing Dr. Gill-King's opinions and conclusions and, "dependent upon [Dr. Symes'] opinion, the results may result in a resolution of this matter." Morrisey also pointed out that a central issue at trial was going to be whether his .22-caliber rifle was the murder weapon and that Dr. Symes' opinion specifically addressed that issue. Morrisey opined that Dr. Symes' opinion would play "a major part" in the State's case. Nevertheless, the District Court denied his motion.

¶77 After the State rested its case-in-chief, Morrisey renewed his argument that he was entitled to disclosure of Dr. Symes' conclusions. He noted that if the State were truly going to call Dr. Symes just to impeach Dr. Gill-King's credibility, then disclosure of Dr. Symes' conclusions was probably not required. However, he contended that if Dr. Symes were going to offer a forensic opinion that differed from Dr. Gill-King's forensic opinion, then disclosure was required. In this regard, Morrisey argued that in substance, what Dr. Symes would be providing was a forensic opinion, not testimony about Dr. Gill-King's credibility. The District Court again denied his motion.

¶78 Dr. Gill-King testified that he examined Dolana's skull to determine what caliber weapon had been used. His ultimate conclusion was that Dolana had been killed by a high-velocity round, traveling much faster than a standard .22 long rifle round, but with a diameter similar to a .22. He stated that in his opinion, it was "very improbable" that the entry and exit wounds had been caused by a .22 long rifle round. Thereafter, the State

called Dr. Symes, who testified that he was present at trial to discuss his examination of Dolana's skull, and Dr. Gill-King's examination of the skull as well. In Dr. Symes' view, Dolana was killed by a low-velocity round fired from a small-caliber weapon, and he concluded that a .22-caliber rifle firing typical ammunition could have been used. Dr. Symes also commented on Dr. Gill-King's report and discussed points on which he disagreed with Dr. Gill-King. On cross-examination, however, Dr. Symes agreed that Dr. Gill-King was "competent and qualified." Dr. Symes also acknowledged that he could not say a .22 rifle had in fact been used.

### III. Analysis

¶79    "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." M. R. Evid. 702. Section 46-15-322(1)(c), MCA, in turn, states that upon request, the prosecutor shall make available to the defendant for examination and reproduction certain material and information within the prosecutor's possession or control, including "all written reports or statements of experts who have personally examined the defendant or any evidence in the particular case, together with the results of physical examinations, scientific tests, experiments, or comparisons."

¶80    Morrisey argues that the State was "statutorily obligated to disclose Dr. Symes' conclusions, given that Dr. Symes was an expert witness—not a rebuttal witness—and he gave pure expert testimony." As it did under Issue 1 (*see* ¶ 36, *supra*), the State responds as follows: "For the sake of complying with the word limits and without conceding that

Dr. Symes' conclusions should have been disclosed to Morrisey prior to trial, the State will forego an analysis of whether an expert who testifies as a rebuttal witness is subject to the disclosure requirements of [§ 46-15-322(1)(c), MCA]." In the State's view, "[e]ven if nondisclosure of Dr. Symes' report was error, it was harmless." While we agree with Morrisey that the State should have provided the requested disclosure, we agree with the State that the error was harmless.

¶81 As noted, the State argued that disclosure of Dr. Symes' opinions and conclusions was not required for two reasons: (1) because the State did not intend to call Dr. Symes in its case-in-chief, but would call him only "as a rebuttal witness to rebut the testimony of" Dr. Gill-King, and (2) because the State would call Dr. Symes only "to impeach the credibility" of Dr. Gill-King. As for the State's first theory, nothing in the statute stands for the proposition that disclosure is not required for experts called by the prosecution "in rebuttal." In this connection, the State pointed out that § 46-15-322(1)(a), MCA, requires the prosecutor to disclose "the names, addresses, and statements of all persons whom the prosecutor may call as witnesses in *the case in chief*" (emphasis added). But Morrisey did not rely on subsection (1)(a). He relied on subsection (1)(c), which requires the prosecutor to disclose "all written reports or statements of experts who have personally examined the defendant or any evidence in the particular case, together with the results of physical examinations, scientific tests, experiments, or comparisons." This requirement is not limited like subsection (1)(a) to "the case in chief," and we reject the State's attempt to insert such language into subsection (1)(c). *See* § 1-2-101, MCA. The State also cited *State v. Weitzel*, 2000 MT 86, ¶¶ 31-32, 299 Mont. 192, 998 P.2d 1154, and

43

*State v. Hildreth*, 267 Mont. 423, 430, 884 P.2d 771, 775-76 (1994), for the proposition that the prosecution is not required by § 46-15-322(6), MCA, to provide notice of a witness called to impeach the credibility of a defense witness. Yet, neither *Weitzel* nor *Hildreth* involved a witness providing expert testimony, and the present case does not involve subsection (6) of § 46-15-322, MCA. But more to the point, the State cannot escape the disclosure requirements of subsection (1)(c) through the mere expedient of cloaking expert-opinion testimony as "credibility-impeachment" testimony.

¶82 As for the State's second theory, however, we agree that under the language of § 46-15-322(1)(c), MCA, the prosecution is not required to disclose the reports of a witness whom the State will not be calling to provide expert testimony. In other words, if the person is being called strictly as a fact witness, the statute's disclosure requirements are not applicable. Thus, as Morrisey acknowledged in the District Court, if Dr. Symes were being called solely to impeach Dr. Gill-King's credibility by some means other than by providing a contrary expert forensic opinion, then disclosure was not required.

¶83 Accordingly, by refusing Morrisey's pretrial request for disclosure of Dr. Symes' opinions and conclusions, the State effectively bound itself not to call Dr. Symes as an expert to provide his opinions about Dolana's skull and the murder weapon (whether in the State's case-in-chief or in rebuttal). Section 46-15-322(1)(c), MCA, is quite clear on this point. And for this reason, while the District Court did not provide an explanation for its decision to deny Morrisey's motion for disclosure, the court's ruling was not necessarily incorrect. The State had vowed several times that it would call Dr. Symes only to impeach Dr. Gill-King's credibility, and the District Court evidently took this to

44

mean that the State would *not* call Dr. Symes to provide expert testimony. The real issue arose when the State did call Dr. Symes to give his expert opinion regarding the gun used to kill Dolana. That testimony clearly fell within the strictures of § 46-15-322(1)(c), MCA, and outside the bounds of what the State had told the court and Morrisey Dr. Symes' testimony would be. Hence, the testimony was objectionable, and a timely objection would have been properly sustained.

¶84 Although Morrisey did not contemporaneously object to Dr. Symes' testimony due to the fact that he had already twice argued that the testimony was improper, we conclude that any error caused by the State's failure to comply with § 46-15-322(1)(c), MCA, was harmless. "A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." Section 46-20-701(1), MCA. Here, while Morrisey claims that he "could not adequately prepare a defense or cross-examination" because he did not know in advance what Dr. Symes' opinions and conclusions were, the record reflects that Morrisey in fact cross-examined Dr. Symes at length. Morrisey surmises that he could have prepared a more vigorous cross-examination; yet, he fails to provide any concrete factual analysis to support this claim. Finally, Morrisey asserts that the State's nondisclosure was "inherently prejudicial"; but on the record before us, we are not persuaded that such prejudice exists here. In short, Morrisey has not adequately demonstrated that he was prejudiced by the State's violation of § 46-15-322(1)(c), MCA.

¶85 ***ISSUE 4. Was there sufficient evidence upon which a jury could find Morrisey guilty of deliberate homicide beyond a reasonable doubt?***

## I. Standard of Review

¶86   We review the sufficiency of evidence to support a conviction to determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Shields*, 2005 MT 249, ¶ 14, 328 Mont. 509, 122 P.3d 421; *State v. Debus*, 2002 MT 307, ¶ 15, 313 Mont. 57, 59 P.3d 1154.

## II. Analysis

¶87   The jury found Morrisey guilty of deliberate homicide. A person commits this offense if he or she "purposely or knowingly causes the death of another human being." Section 45-5-102(1)(a), MCA (1987). Morrisey argues that the evidence presented at trial was not sufficient for a rational trier of fact to find that he purposely or knowingly caused Dolana's death. He observes that the police found no direct evidence connecting him to Dolana's disappearance or death, and he argues that the State's physical evidence was inconclusive. In Morrisey's view, the State's case rested on "witnesses' concerns" about the amount of time he and Dolana spent together and the detectives' "impression" that he was responsible for her death. Morrisey points out that he was a "close friend" of the Clark family, that he helped search for Dolana on the night she disappeared, and that he even put up a reward for information regarding her disappearance and contacted the National Center for Missing Children. Morrisey thus contends that his conviction must be reversed due to insufficient evidence of his guilt. We disagree.

¶88   This Court reviews a jury's verdict to determine whether sufficient evidence exists to support the verdict, not whether the evidence could have supported a different result.

*State v. Field*, 2005 MT 181, ¶ 15, 328 Mont. 26, 116 P.3d 813. Here, the evidence against Morrisey was indisputably circumstantial. Shortly after Dolana disappeared in 1988, the investigating officers thoroughly searched Morrisey's residence; and although they gathered evidence of fibers and stains, none of this evidence indicated that Morrisey was involved in Dolana's disappearance. Similarly, after spending several days in 2002 searching his Colorado residence and vehicles, the officers again found no physical evidence conclusively connecting Morrisey to Dolana's death.

¶89 As a result, the prosecution relied on circumstantial evidence of Morrisey's guilt. "Circumstantial evidence" is "that which tends to establish a fact by proving another and which, though true, does not of itself conclusively establish that fact but affords an inference or presumption of its existence." Section 26-1-102(1), MCA. Circumstantial evidence is sufficient by itself to sustain a conviction if it is of such a quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt, when all of the facts and circumstances are considered collectively. *See State v. Rosling*, 2008 MT 62, ¶ 36, 342 Mont. 1, 180 P.3d 1102; *State v. Hill*, 2008 MT 260, ¶ 35, 345 Mont. 95, 189 P.3d 1201. Where, as here, circumstantial evidence is susceptible to two reasonable interpretations, one which supports guilt and the other which supports innocence, the trier of fact determines which interpretation is most reasonable. *Rosling*, ¶ 36.

¶90 According to the evidence presented at trial, Morrisey told the police in 1988 that on the day of her disappearance, Dolana stopped by his house at 10:00 a.m. for a short visit and was supposed to return at 12:30 p.m. so that he could drive her to the pet store to see the cat she wanted to purchase. Yet, Lisa (Dolana's half-sister) testified that she,

Dolana, and their mother were together at the Clark home all of that morning until about 1:00 p.m. Morrisey also claimed in 1988 that he did not see Dolana again after their alleged 10:00 a.m. visit. Yet, during his interview with the detectives in 2002, he stated that he saw Dolana between 2:00 p.m. and 4:00 p.m. on the day she disappeared.

¶91 On the night of Dolana's disappearance, Morrisey, Lisa, and Rick (a brother-in-law of Dolana and Lisa) agreed to search for Dolana. Rick testified that he suggested they split up to cover more ground, but Morrisey rejected that idea. Rick also testified that Morrisey did not want to use either of his own vehicles in the search.

¶92 The Clarks did not have a telephone in their home and often used Morrisey's phone. Yet, after Dolana disappeared, Morrisey stayed at the Clark home for several days, even though he had told people that Dolana, if she could, would try to call him at his house or would simply show up there. In addition, Vicki (another of Dolana's half-sisters) testified that about a week after Dolana disappeared, Morrisey suggested, without explanation, that Vicki call the police and report that she had spotted Dolana's bike in a river, even though this information was untrue.

¶93 About two weeks after Dolana's disappearance, Morrisey discontinued all contact with the Clarks, despite having had a close relationship with the family for years. Two or three months later, he left Great Falls and never spoke to any of the Clarks again. Notably, during his interview with the detectives in 2002, he stated a number of times that he wished he had never met "them people."

¶94 Dr. Jack Henneford testified at Morrisey's trial as an expert in forensic pathology. He had examined Dolana's skull in 1989 and located an entrance wound at the base of the

48

skull and an exit wound in the forehead. Based on the measurement of these wounds, he concluded that they had been caused by a small-caliber bullet, such as a .22, though he acknowledged that a range of weapons could have produced the wounds. Likewise, neither Dr. Symes nor Dr. Gill-King could say for certain what caliber weapon was used; however, Dr. Symes thought that it could have been a .22-caliber rifle firing typical ammunition.

¶95 In 2002, Morrisey learned through his friend Melvin that the police had renewed their investigation into Dolana's death and were asking about Morrisey's cars and small-caliber guns. According to Melvin, Morrisey seemed nervous at the mention of his cars and stated that because Dolana had been in the Impala a lot, the police would find her DNA there. Morrisey thereafter destroyed his .22 rifle—a rifle his mother had given him when he was 12 years old. Moreover, when the detectives arrived in Colorado to execute the search warrants, they found his house to be "almost sterile" and his Camaro to be "spotless." Likewise, the Impala was "immaculate" and the trunk had been sprayed with a heavy-duty black paint or bedliner. The detectives found the following items inside the Impala: a .45-caliber "Tommy gun," a fully loaded 10-shot clip, an 11-shot clip, and 400 rounds of .45 ammunition; water bottles; cat food; and a drawer containing personal possessions such as family photographs, birth and death certificates, baby books, a Social Security card, school records, and other memorabilia. The tank was full of gas, and the keys were in the ignition. Morrisey told the detectives that he kept the ammunition in his vehicle in case of fire, because keeping it in the house would pose a danger to the responders; yet, they found a box of .38-special ammunition in the kitchen.

¶96    Morrisey's statements to the police, which were introduced into evidence, were riddled with inconsistencies and contradicted by the other testimony and evidence.  For instance, at the time of Dolana's disappearance, Morrisey told investigators that he did not own any guns; however, he admitted to the detectives during the 2002 interview that he owned a .22-caliber rifle when he was living in Great Falls.  Morrisey claimed that his gun was in a closet when the officers searched his house in 1988; yet, the investigating officers did not find any guns in Morrisey's closets.  When asked where the .22 was now, Morrisey stated that he had sold it several years earlier at a flea market in Illinois, but after further questioning he changed his story and stated that he had thrown it off a bridge into the Mississippi River.  Still later, Morrisey admitted that he had recently disposed of the gun after learning about the renewed investigation.  He explained that he had done so because he was afraid that the gun would be used to "pin" Dolana's death on him.

¶97    Morrisey agreed with the detectives that either he or Dolana's father (Boyce) had killed Dolana and that there was no "bogeyman" out there, i.e., "it's just down to [Morrisey] did it or [Boyce] did it."  But Morrisey claimed that he had loaned his gun to Boyce about a week before Dolana disappeared and that Boyce had returned the gun about a week after her disappearance.  Morrisey asserted that Boyce then admitted to killing Dolana with the .22.  However, Morrisey acknowledged that he did not report this admission to the police at any point during the preceding 14 years, notwithstanding the fact that Morrisey had been a suspect back in 1988 and notwithstanding the fact that he purported to love Dolana.  Morrisey explained that he kept Boyce's admission to himself because he and Boyce were friends and he was only revealing it now because he was "in

a big jam." Yet, Morrisey later characterized Boyce as a "son of a bitch" and stated that he wanted nothing to do with Boyce.

¶98 In conclusion, although the evidence presented at Morrisey's trial was susceptible to multiple reasonable interpretations, some pointing to his guilt and others pointing to alternative explanations for his actions, this does not mean that the evidence was insufficient to support a verdict of guilty. It was the province of the jury to decide which interpretation of the evidence was most reasonable. *Rosling*, ¶ 43. It was also the province of the jury to decide the credibility of each witness and the weight to be given their testimony and, in the event of conflicting evidence, to determine which will prevail. *See State v. Merrick*, 2000 MT 124, ¶ 13, 299 Mont. 472, 2 P.3d 242; *State v. Baker*, 2004 MT 393, ¶ 22, 325 Mont. 229, 104 P.3d 491; *State v. Maetche*, 2008 MT 184, ¶ 14, 343 Mont. 464, 185 P.3d 980. Having reviewed the record, we hold that when all of the facts and circumstances are considered collectively and in the light most favorable to the prosecution, the circumstantial evidence in this case was of sufficient quality and quantity that a rational trier of fact could find beyond a reasonable doubt that Morrisey purposely or knowingly caused Dolana's death.

## CONCLUSION

¶99 The District Court correctly denied Morrisey's motion to suppress and his motion to dismiss for lack of a speedy trial. Although the State did not properly comply with § 46-15-322(1)(c), MCA, Morrisey has not demonstrated that he was prejudiced by this error. Lastly, we hold that there was sufficient evidence presented at trial to support the jury's guilty verdict.

¶100   Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER

/S/ JOHN WARNER

/S/ W. WILLIAM LEAPHART

/S/ JIM RICE