Patricia BUSTER, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

and

Patricia Buster, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2011–SC–000002–MR, 2011–SC–000005–MR.

Supreme Court of Kentucky.

April 26, 2012.

---

Steven Jared Buck, Assistant Public Advocate, Department of Public Advocacy, Frankfort, K, Counsel for Appellant.

Jack Conway, Attorney General, Christian Kenneth Ray Miller, Assistant Attorney General, Office of Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant Patricia Buster entered a conditional guilty plea to four counts of complicity to first-degree rape. Appellant's conditional guilty plea preserved her right to appeal the adverse ruling of the trial court on her motion to suppress her written confession. This Court finds that Appellant did not voluntarily waive her *Miranda* rights, and therefore the trial court's denial of the motion to suppress is reversed. Appellant's conviction is vacated and this case is remanded to the trial court so that the Appellant can withdraw her guilty plea.

## I. Background

This case arose when a young woman reported to the police that Kenny Buster sexually abused and raped her when she was a child, and that Kenny's wife, Appellant, was present when it happened. Eventually, ten other victims of the Busters were identified through investigations by the police and the Cabinet for Health and Family Services. The evidence against Appellant was not fully developed in the record because the case was cut short by Appellant's conditional guilty plea. As relevant to this appeal, the underlying allegations are as follows: Appellant and Kenny abused children they babysat at their house in the 1990s and early 2000s. The victims, who were mostly young girls under the age of twelve at the time, were raped and sexually abused by Kenny while Appellant was present. Appellant also participated directly in some of the sexual abuse; several victims said that Appellant had touched their vaginas with her fingers. The victims started to come forward in the fall of 2009.

Appellant is mentally retarded. One expert found that she obtained a Full Scale IQ score of 65, which placed her in the "extremely low" range. Another expert found that she had "significantly substandard intelligence" and that she functioned at the level of a nine- or ten-year-old child in the areas of abstract reasoning, written word recognition, and oral comprehension.

Appellant had attended special education classes through the twelfth grade. At the time she was arrested, she was 40 years old.

The investigation in the fall of 2009 culminated in the arrest of Appellant by the Munfordville City Police on November 24, 2009. Once Appellant was brought to the police station, Police Chief Greg Atwell informed Appellant of her right to remain silent and her right to counsel, and she told him that she had nothing to say to him. Atwell stopped questioning her.

Benson Bell, a social worker for the Cabinet for Health and Family Services, had learned of the arrest and was on his way to the police station. Bell was apparently involved in investigating the allegations the Cabinet had received about the sex abuse, and he was working in cooperation with the police. He had interviewed Appellant twice in the weeks leading up to her arrest. At the second interview, Appellant had provided him a list of the victims, which he then turned over to the police with her knowledge. Bell believed that he had developed some rapport with Appellant through these interviews. However, Bell was not acting as an advocate or representative for Bell during this process; he was investigating allegations against her.

Atwell contacted Bell to let him know that it was unnecessary for him to come to the police station because Appellant was refusing to answer questions. Bell knew that Appellant did not like Atwell because of a previous criminal investigation, and so Bell asked Atwell to ask Appellant if she would be willing to speak to Bell. Atwell did so, and Appellant agreed, stating, "I will talk to Benson."

Bell spoke privately with Appellant at the police station for about half an hour. There are no video or audio recordings of any of the interviews at the police station,

so the facts described below are based on the testimony of Atwell and Bell at the suppression hearing. Bell described his private discussion with Appellant as a "good conversation." Bell said that Appellant was upset and stressed at once again facing investigation about child sex abuse. She cried for about half the time he was with her. Bell said he told her that victims were continuing to come forward and that this could continue for the rest of Appellant's life as the victims got older, more verbal, and braver. Bell and Appellant talked about her wanting to get the past behind her and move forward with her life. Eventually, she said she wanted to give a statement to the police. Bell notified Atwell that Appellant was willing to talk.

Atwell returned to the interview room and again advised Appellant of her *Miranda* rights. Atwell gave her a waiver form titled "Statement of Rights," which she signed. Atwell and Bell then questioned Appellant about specific victims. Atwell then asked Appellant to make a written statement on the police department's standard form. Appellant handwrote a six-page statement on these forms. Her statement lists the names of each victim and describes specific acts of sexual abuse that Appellant witnessed or performed herself.

In two indictments, Appellant was charged with a total of 16 counts of first-degree sex abuse, 341 counts of complicity to first-degree sex abuse, 19 counts of complicity to first-degree sodomy, 12 counts of first-degree rape, 33 counts of complicity to first-degree rape, and one count of first-degree unlawful imprisonment.

Appellant later filed a motion to suppress the November 24th written statement, claiming that she did not intelligent-

ly and knowingly waive her rights and that her confession was not voluntarily made. The trial court held a suppression hearing and denied the motion. Appellant entered a conditional guilty plea to four counts of complicity to first-degree rape under one indictment, and to first-degree rape, first-degree sodomy, and first-degree sexual abuse under the other. She was sentenced to twenty years' imprisonment. The plea preserved Appellant's right to appeal the adverse ruling of the trial court on the motion to suppress.

## II. Analysis

Appellant argues that the trial court erred in denying the motion to suppress for multiple reasons: that the police improperly continued to question her after she invoked her right to remain silent; that she lacked the mental capacity to voluntarily, knowingly, and intelligently waive her *Miranda* rights; and that her confession was not voluntary because it was the result of coercive police activity, such as the police allegedly telling her what to write in her statement. This Court reverses the trial court under Appellant's first argument and therefore does not reach the remaining issues.

Appellant's first argument is that her waiver of her rights was involuntary because the police failed to respect her invocation of her right to silence. Specifically, Appellant argues that by re-approaching her and asking her if she wanted to speak to Bell, Atwell demonstrated to Appellant that her desire to remain silent would not be respected. And Appellant argues that the conversation with Bell had the effect of pressuring her to waive her right to remain silent.

### A. Preservation of the Issue.

■ The Commonwealth objects to any review of this issue, arguing that it was not raised at the trial court. As an initial matter, the Commonwealth argues that this issue was not preserved by the conditional guilty plea. Under a conditional guilty plea, this Court may only review those issues that were specifically preserved in the guilty plea (as well as a few other types of issues, such as a claim that the indictment did not charge an offense, that are not relevant to this case). RCr 8.09; *Dickerson v. Commonwealth,* 278 S.W.3d 145, 149 (Ky.2009); *Lovett v. Commonwealth,* 103 S.W.3d 72, 84 (Ky.2003). Here, Appellant's guilty plea document preserved her right to appeal the "adverse ruling of the trial court on [her] motion to suppress." This language logically includes any issue that was raised to and ruled on by the trial court on the suppression motion.

The Commonwealth argues that the sole issue raised to and ruled on by the trial court was whether Appellant's mental state rendered her waiver not knowing, intelligent, and voluntary. In other words, the Commonwealth argues, the trial court's decision was focused exclusively on the effect of Appellant's mental retardation on her confession.

This broad assertion is not accurate. Although much of the evidence presented at the suppression hearing related to Appellant's mental retardation, defense counsel also presented evidence and arguments about the allegedly coercive actions of Atwell and Bell. Specifically, defense counsel argued at the hearing that Bell's statements during his half-hour conversation with Appellant were coercive.

The defense counsel's oral argument to the trial court was brief—about four minutes long—and fairly general. She did not go into much detail about the relevant law, but she did present a basic outline of the claim now argued on appeal: that Bell's

conversation with Appellant coerced her into making a statement to the police.

And the trial court addressed the question of coercion in its written judgment:

> In obtaining this written confession, this Court finds that Atwell and/or Bell used none of the following tactics: (1) physical or mental coercion, (2) threats or promises, and (3) deceit or trickery. Instead, Buster explained that she was upset because she was once again facing another criminal investigation over sexual abuse charges. In response, Bell truthfully explained that Buster could face additional investigations unless she cooperated and identified all of the sexual abuse victims. Buster then agreed to speak to Atwell.

Thus, defense counsel raised and the trial court addressed the question of whether Bell's conversation with Appellant was coercive. This Court finds that this issue was included in the conditional guilty plea.

The Commonwealth compares this case to *Henson v. Commonwealth*, 20 S.W.3d 466 (Ky.1999), in which this Court declined to consider a claim about the voluntariness of a waiver because the defendant had not presented it to the trial court. In *Henson*, the defendant argued to the trial court that his confession was involuntary because he felt threatened by a police officer's statement. *Id.* at 468. On appeal, he made the additional argument that his *Miranda* rights were violated because he claimed he asked for an attorney and the police did not cease interrogation. *Id.* at 470. The Court declined to address the second issue because it had not been presented to the trial court. *Id.*

*Henson* is clearly distinguishable from this case. In *Henson*, there had apparently been *no* argument to the trial court about his second claim. Here, Appellant brought the factual basis for the claim to the court's attention and argued specifical-

ly that those actions had been coercive. The argument presented by Appellant on appeal is not an attempt to feed the Court a "new can of worms," as it was in *Henson*. *Id.* at 471. Appellant's argument on appeal is simply a more focused and specific version of the argument she presented to the trial court. It is not uncommon for litigants to refine their claims when they get to the appeals stage to present clearer and better supported arguments.

## B. Merits of Appellant's Claim.

 Having determined that review of this issue is appropriate, this Court now turns to the merits of Appellant's argument about the voluntariness of her waiver of her *Miranda* rights. On appellate review of a trial court's suppression ruling, factual findings by the trial court are reviewed for clear error, and the application of the law to the facts is conducted *de novo*. *Cummings v. Commonwealth*, 226 S.W.3d 62, 65 (Ky.2007). The Commonwealth bears the burden of showing by a preponderance of the evidence that a defendant's waiver of her rights was voluntary, knowing, and intelligent. *Mills v. Commonwealth*, 996 S.W.2d 473, 482 (Ky. 1999).

 Appellant's claim is that she invoked her right to remain silent but Atwell and Bell ignored this invocation and pressured her to give a statement. She claims that their actions render her waiver not voluntary because the police did not scrupulously honor her right to cut off questioning.

 A defendant must unequivocally assert her right to remain silent in order to cut off questions from the police. *Berghuis v. Thompkins*, —— U.S. ——, ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010). But the defendant's invocation of her rights need not be formal. She may

simply tell the police that she does not want to talk to them. *Id.* at 2256; *see State v. Morrisey,* 351 Mont. 144, 214 P.3d 708, 722 (2009) (defendant's statement, "I ain't saying nothing," was sufficient to assert the right to remain silent); *State v. Crump,* 834 S.W.2d 265, 269 (Tenn.1992) (defendant's statement, "I don't have anything to say," was sufficient).

Here, the evidence of Appellant's assertion of her right to remain silent comes from Atwell's testimony at the suppression hearing. Atwell reported that after he read Appellant her *Miranda* rights, "she said she did not have nothing to say to me." Atwell then contacted Bell and told him that Appellant "did not want to speak to us." The Commonwealth argues on appeal that Appellant's assertion of her right could be considered equivocal because her statement that she had nothing to say could have been directed at Atwell specifically, rather than all police officers. But Atwell obviously understood Appellant's statement to be unequivocal since he immediately stopped questioning her and called Bell to tell her that she was refusing to answer questions, partly in an attempt to save Bell from making the trip to the police station. The trial court also believed that Appellant had asserted her right to remain silent; the court held that Appellant's initial refusal to speak to Atwell showed that she understood her right to remain silent and was asserting it. This Court agrees that there was nothing equivocal about Appellant's assertion of her right to remain silent.

██ Once an individual being questioned has asserted her right to remain silent, the police must end the interrogation. In *Miranda,* · the U.S. Supreme Court explained what should happen next:

> If the individual indicates in any matter, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

*Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Despite its use of absolute language, the Supreme Court has not subsequently read *Miranda* as establishing a bright-line rule that police may never return to questioning a suspect who has invoked his right to silence. *See Michigan v. Mosley,* 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) ("[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests."); *see also Commonwealth v. Vanover,* 689 S.W.2d 11, 12 (Ky.1985) ("In *Michigan v. Mosley,* the U.S. Supreme Court held that once the right to silence was invoked, *Miranda* did not create a per se prohibition of indefinite duration on any further questioning.").

*Mosley* was the first case to substantially interpret *Miranda*'s right to cut off questioning. In *Mosley,* the suspect asserted his right to remain silent during an interrogation about a series of robberies. The police officer ceased questioning at that point. Two hours later, a different officer again read the suspect his rights and began questioning him about an unrelated murder, and during that second questioning, the suspect made incriminating statements that he argued should have been suppressed under *Miranda.* *Mosley,* 423 U.S. at 104, 96 S.Ct. 321.

The Court in *Mosley* held that the "admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. 321 (quoting *Miranda*, 384 U.S. at 474, 479, 86 S.Ct. 1602). In making this inquiry, the Court looked at several circumstances surrounding the series of interrogations: (1) whether the suspect was informed of his *Miranda* rights before the initial interrogation; (2) whether the officer "immediately ceased the interrogation and did not try either to resume the questioning or in any way persuade [the suspect] to reconsider his position" once the suspect invoked his right to silence; (3) the differences in the circumstances between the original and subsequent interrogation, such as whether it was about the same or different offense, the length of time between the two interrogations, whether it was conducted in a different location, and whether it was conducted by a different officer; and (4) whether the suspect was re-informed of the *Miranda* rights before the second interrogation. *Id.* at 104–05, 96 S.Ct. 321.

Though *Mosley* did not expressly lay these circumstances out as a list of factors to consider, other courts, including this one, have addressed them in that manner. *See, e.g., Mills*, 996 S.W.2d at 482. In following the factor approach, it is important to remember that the "factors" in *Mosley* are not exclusive or exhaustive, and no one factor is more important than the others. *Id.* at 483.

Here, Appellant was informed of her *Miranda* rights when she arrived at the police station. Thus, the first *Mosley* factor favors the Commonwealth.

The second *Mosley* factor addresses the response of the police to a suspect's invocation of her right to silence. Here, Atwell read Appellant her rights, and then, as discussed above, Appellant invoked her right to silence. Atwell immediately stopped questioning her and called Bell to tell him that he did not need to come to the station because Appellant was refusing to talk. However, Atwell approached Appellant again a few moments [1] later to ask if she would talk to Bell. Once Bell arrived at the station, Atwell allowed him to talk to Appellant alone for about half an hour. For the reasons explained below, this Court finds that these actions constituted an attempt by Atwell and Bell to try to "persuade [Appellant] to reconsider" her invocation of her right to remain silent. *Mosley*, 423 U.S. at 105, 96 S.Ct. 321.

As an initial matter, the fact that Bell is a social worker rather than a police officer does not mean that his actions could not violate Appellant's rights under *Miranda* and *Mosley*. Bell was conducting an investigation on behalf of the Cabinet, an arm of the state, so he had the power of the Commonwealth behind him. Bell's investigation appears to have been indistinguishable from the police investigation because Bell was turning over all

---

1. *It is apparent from the record that these events happened in rapid succession. Appellant was arrested and read her rights at 1:40 p.m. She signed the waiver of rights at 2:29 p.m. In those 49 minutes, the following events happened: Appellant told Atwell that she did not wish to talk to him, Atwell called Bell, Atwell asked Appellant if she would talk to Bell and she agreed, Bell arrived at the station, Bell talked to Appellant for approximate-* ly half an hour, Appellant agreed to talk to Atwell, and Atwell went over the waiver forms with Appellant prior to her signing them. In addition, Atwell's testimony implies that these events happened over a short period of time. Thus, the Commonwealth is incorrect in asserting that we do not know how much time transpired between Appellant's decision not to talk to Atwell and his subsequent question to her.

his information to the police. And, importantly, his discussion with Appellant was conducted with the permission of the police while she was in custody. Thus, this Court considers Bell to be a government actor in this case, and he was subject to the same constraints as a police officer in what he could do or say to Appellant. *Cf. Hartsfield v. Commonwealth,* 277 S.W.3d 239, 245 (Ky.2009) (finding that a SANE nurse's interview was the "functional equivalent of police questioning"); *James v. Commonwealth,* 360 S.W.3d 189 (Ky. 2012).

At the suppression hearing, Atwell and Bell did not explain their purpose in having Bell talk to Appellant. But it is difficult to imagine what purpose they could have had other than convincing Appellant to talk to the police. Bell's role was an investigator for the Cabinet working in cooperation with the police. He had previously interviewed Appellant twice as part of his investigation and had asked her several times to make a statement to him or to provide a list of victims. Once Appellant had told Atwell that she had nothing to say, there could be no reason for Bell to talk to her other than trying to convince her to change her mind. And, relatedly, there could be no reason for Atwell to *allow* Bell to talk to her after she had refused, to talk, other than trying to change her mind.

This Court's finding that Bell's conversation was for the purpose of persuading Appellant to reconsider her invocation of her rights is also supported by Bell's description of what he talked about with Appellant. Bell described his interaction with Appellant as a "good conversation." He said they discussed the stresses and difficulties that Appellant had faced as a result of being investigated for child sexual abuse. They discussed Appellant's desire to move on with her life and put the past behind her. Bell said: "She and I discussed the possibility of her talking with me about her participation, and what she had done, in order to take this first step to put this behind her, to move on with her life that she wanted to start." Bell denied that it was a "pressure situation" or that he had given Appellant any specific advice about whether to talk to him or to Atwell. Instead, Bell said, his role was to give her "support" as she decided what she should do next.

This Court is skeptical that Bell, who was actively investigating Appellant and who admitted he wanted her to make a statement because it would help his investigation, could truly act as a neutral "supporter" as he talked with Appellant while she was in custody at a police station. More importantly, the decision that Bell was supposedly supporting her in making—whether or not she should make a statement to him or to Atwell—had already been made. Appellant had already unequivocally asserted her right to silence, and there was no need for further discussion.

This Court finds that Atwell's decision to re-approach Appellant to ask if she would talk to Bell,[2] as well as Bell's half-hour conversation with her, constituted efforts by Atwell and Bell to persuade Appellant to reconsider her invocation of her right to silence. By ignoring her invocation of her right almost immediately and by talking with her at length about a decision she had already made, Atwell and Bell "persist[ed] in repeated efforts to wear down [her]

**2.** The Commonwealth argues that it would be important for the Court to know the manner in which Atwell asked Appellant if she would speak to Bell (i.e., forcefully or passively).

This Court does not believe that this factual information is necessary to the analysis because Atwell's question to Appellant was inappropriate no matter how he asked her.

resistance and make [her] change her mind." *Mosley*, 423 U.S. at 105–06, 96 S.Ct. 321. Thus, the second *Mosley* factor weighs heavily against a finding that the police scrupulously honored Appellant's right to cut off questioning.

The third *Mosley* factor considers the differences between the first and subsequent interrogations, such as the length of time between the interrogations, whether they were about the same crime or different ones, whether subsequent interrogations were conducted in the same or different locations, and whether they were conducted by different interrogators. The underlying question is whether the circumstances of the subsequent interrogations "undercut [the suspect's] previous decision not to answer [an interrogator's] inquiries." *Mosley*, 423 U.S. at 105, 96 S.Ct. 321.

In *Mosley*, there were two distinct interrogations with a defined break in between. Here, Appellant was essentially in constant contact with Atwell, Bell, or both from when she arrived at the station to when she finished writing her confession and signed it approximately two hours later.[3]

First, Atwell read Appellant her rights and she asserted her right to silence. Moments later, Atwell re-approached her to ask if she would talk to Bell. There seems to have been a break of a few minutes before Bell arrived at the station. Then Bell spoke with Appellant for about half an hour. Once Appellant agreed to speak with Atwell, both Atwell and Bell were with Appellant for the next hour as they asked her questions about the victims and she wrote her written confession.

■ All of these interactions between Bell, Atwell, and Appellant can be considered "interrogations" for the purposes of this analysis. The U.S. Supreme Court has defined "interrogation" as "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Direct questioning of the suspect, as well as other words or actions intended to elicit incriminating responses, can be defined as interrogation. *See id.* As discussed above, the only logical purpose of Bell's conversation with Appellant was to persuade her to make statements that would be helpful to the police investigation or the Cabinet investigation. Thus this Court views Bell's "conversation" with Appellant as an interrogation.

It is clear that the length of time between the various interrogations was short. There was a break of a few moments between Appellant's assertion of her right to silence and Atwell's question if she would speak to Bell, and then there was a break of several minutes before Bell arrived at the station and entered the room to talk with Appellant.

It is also clear that all the interrogations were about the same series of crimes.

It appears that the interrogations happened in the same location at the Munfordville Police Station, although there was no testimony about the specific room(s) in the police station where the interrogations took place.

Because the subsequent interrogations in this case were essentially continuous, separated only by short breaks, and because there were no differences between the interrogations other than the identity of the interrogator, this Court finds that

---

3. The trial court noted that Appellant was arrested at the station at 1:40 p.m., that she signed the "Statement of Rights" at 2:29 p.m., and that she signed the written confession at 3:38 p.m.

the subsequent interrogations "undercut [Appellant's] previous decision not to answer [Atwell's] inquiries." *Mosley,* 423 U.S. at 105, 96 S.Ct. 321. Thus, this factor also weighs against a finding that Appellant's right to cut off questioning was scrupulously honored.

The fourth *Mosley* factor is whether the suspect was again read her rights before subsequent interrogations. Here, Appellant was read her rights a second time after she told Bell that she would talk to Atwell. Atwell read to her from a written waiver form, which she then signed. Usually, a second *Miranda* warning would favor a finding that the police had scrupulously honored a suspect's right to cut off questioning. But here, the effectiveness of the second *Miranda* warning is undercut by its timing. After the first *Miranda* warning and Appellant's invocation of her rights, Atwell re-approached her once and Bell talked to her for half an hour without again telling her that she had the right to cut off questioning. Only *after* these two interactions with Atwell and Bell was Appellant re-informed of her rights, just prior to making the confession. This Court does not consider this factor to weigh strongly in favor of either side.

Considering the totality of the circumstances in light of the *Mosley* factors, this Court finds that the police did not scrupulously honor Appellant's right to cut off questioning. Even though Appellant was twice read her rights, the overwhelming impression from this course of events is that Bell and Atwell did not respect Appellant's invocation of her rights. Therefore, Appellant's written statement is not admissible.

The Commonwealth argues that this case is nearly identical to *Mills,* 996 S.W.2d 473, a case in which this Court held that the police scrupulously honored the suspect's right to cut off questioning de-

spite engaging in a second interrogation. In *Mills,* a detective arrested the defendant at the scene of the crime and informed him of his *Miranda* rights. *Id.* at 479. The defendant said he did not want to talk to the detective. *Id.* A second detective arrived at the scene about ten minutes later. *Id.* Despite having been informed that the defendant had already been read his rights, the second detective also informed him of his rights. *Id.* The defendant said he would talk to the second detective and subsequently made a confession to the crime. *Id.* The defendant in *Mills,* like the defendant in this case, had a low IQ. *Id.* at 481.

This Court in *Mills* held that the police had scrupulously honored the defendant's invocation of his right to silence. Although the Court was troubled by the short amount of time between the defendant's refusal to talk to the first detective and the questioning conducted by the second detective, the Court ultimately held that the defendant had not been coerced. *Id.* at 483. The Court held that the detectives' actions "were compatible with Mills' right to control the questioning by allowing Mills to determine with whom he would and would not talk." *Id.*

*Mills* is distinguishable from the present case. In *Mills,* the suspect was read his rights, left alone for ten minutes, and then approached by a *different* detective and read his rights again. It is not clear from the facts in *Mills* what the second detective knew about the suspect's initial refusal to talk; the opinion simply states that the second detective knew that the suspect had previously been read his rights. The second interrogator's knowledge about the suspect's refusal is relevant to the inquiry. *See Hatley v. Lockhart,* 990 F.2d 1070, 1074 (8th Cir.1993) (the second interviewer's lack of knowledge of the defendant's earlier refusal to talk supports an infer-

ence that the police scrupulously honored the suspect's right to cut off questioning). Here, Bell and Atwell were both fully aware of Appellant's initial invocation of her rights, but they ignored it.

Moreover, in *Mills*, the only evidence of police coercion was the second detective approaching the suspect a short period of time after he had invoked his rights. The suspect in *Mills* apparently agreed immediately to talk to the second detective as soon as he approached him. *Id.* at 479. Here, Appellant agreed to speak to Bell but did not immediately agree to make a statement to Atwell. It was only after a half-hour conversation with Bell that Appellant agreed to speak to the police. As discussed above, the purpose and effect of Bell's conversation with Appellant was to persuade her to change her mind about her invocation of her rights. Thus, there is significantly more evidence of government pressure in the present case than there was in *Mills*.

### III. Conclusion

For the foregoing reasons, Appellant's conviction is vacated and the case is remanded for further proceedings consistent with this opinion. This opinion does not address Appellant's additional claim that the trial court erred in assessing public defender fees, because the final judgment of conviction is vacated and any assessment of fees may play out differently in the further proceedings.

All sitting. All concur.