# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: SEPTEMBER 27, 2018
NOT TO BE PUBLISHED

# Supreme Court of Kentucky



FINAL

DATE 10/18/18 Kim Redmon, DC

2017-SC-000543-MR

JAMES CARL RENN SR.                                              APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                 HONORABLE BARRY WILLETT, JUDGE
NO. 15-CR-001318

COMMONWEALTH OF KENTUCKY                    APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

James Carl Renn, Sr. (Renn) was convicted by a Jefferson County jury of incest, rape, and indecent or immoral practices with another. The jury recommended, and the trial court imposed, a total sentence of seventy-one years' imprisonment. Renn now appeals as a matter of right pursuant to Section 115 of the Kentucky Constitution. After careful review, we affirm the conviction.

## I. BACKGROUND.

Renn was charged with two counts of incest relating to his two daughters, Betty and Beverly, in 1972.[1] In 1973, the charges were dismissed. The reason for the dismissal is unclear from the record but it appears to be based, in part, on Betty and Beverly moving to Texas with their mother.

In 2012, Beverly, then approximate age 53, contacted the Jefferson County children's victim unit, inquiring about the original case. Detective Rico Williams requested that Renn meet with him. Renn voluntarily agreed to meet with Det. Williams the following day. During the interview, Det. Williams informed Renn that he was not under arrest and he could leave at any time.

Renn was indicted again in 2015 on multiple counts of rape, incest, and indecent or immoral practices with another[2] based on the same allegations of abuse perpetrated against Betty and Beverly in the early 1970s. Prior to trial, the Commonwealth requested permission to ask direct questions and make argument in front of the jury about Renn's pre-custodial, pre-*Miranda* silence to questions related to the sexual abuse allegations brought up in Renn's interview with Det. Williams. Over Renn's objection, the trial court granted the Commonwealth's motion.[3]

Betty testified at trial. She recalled instances when she was approximately nine or ten years old when Renn raped her. She testified that

---

[1]Renn's two daughters are Beverly Livingston (formerly Renn) and Mary Elizabeth "Betty" Cash (formerly Renn). The opinion will refer to the daughters as Beverly and Betty.

[2]The charges of indecent or immoral practices with another are pre-penal code offenses.

[3]Only portions of the interview were played for the jury due to some portions being excluded from evidence pursuant to Kentucky Rule of Evidence (KRE) 404(b).

2

Renn also inserted the handle of a screwdriver, pencils, and popsicle sticks into her vagina. Betty could not identify specific dates or locations of any of the instances and the jury acquitted Renn of all the charges against him involving Betty.

Beverly also testified, identifying several instances of abuse. Specifically, Beverly described an incident when she attempted to steal money from her father's pants in her parent's bedroom. Renn caught Beverly and forced her to perform oral sex on him in the bedroom. Beverly next testified to an incident where Renn took her from her bedroom to the living room, performed oral sex on her, and rubbed his penis against her vagina. Beverly testified to an additional incident when Renn woke her by performing oral sex on her and then proceeded to vaginally rape her.

After Renn raped Beverly, there were no further incidents. After the 1972 indictment, Beverly testified to speaking with a judge in chambers about what happened. She then moved to Texas with her sister and mother and nothing happened with the case until she contacted Detective Angela Merrick[4] in Louisville in 2012.

Renn then reiterated his objection to the Commonwealth using his statement to Det. Williams, arguing that he did, in fact, invoke his right to remain silent. The trial court made no change in its previous ruling. Det. Angela Merrick testified that she was assigned the case in 2012 when Beverly

[4]Several detectives investigated the case. Detective Merrick was the initial investigator. Detective Williams took Renn's statement. Detective Jennifer Hall handled the remainder of the case.

inquired about the case's status. Prior to being assigned to a different unit in the department, Det. Merrick obtained statements from Beverly and Betty and searched for photographs that Beverly believed were taken by Renn.

Det. Williams received the case from Det. Merrick and testified to the interview he had with Renn at Det. Williams' office. The interview was admitted and played for the jury. Det. Williams also testified that he attempted to contact the witnesses and their mother but admitted he conducted no further investigation. Det. Jennifer Hall received the case next. Det. Hall contacted Beverly and Betty, attempted to locate the 1972 case file and contact other individuals from the 1972 case, and she presented the case to the grand jury.

Renn moved for a directed verdict and the Commonwealth conceded it had not proved certain charges in the indictment. Four counts were dismissed by the trial court. Renn further argued that the witnesses' testimonies varied from their initial statements to Det. Merrick, and the Commonwealth's inability to prove the four dismissed charges of the indictment mandated a directed verdict in Renn's favor. The trial court denied the motion.

Renn called two witnesses in his defense. James Carl Renn, Jr., Renn's son, testified that he had no knowledge of any sexual misconduct regarding his father and his sisters. He also testified that he did not trust his sister. Renn's second witness was a deputy circuit court clerk to introduce a certified record of the 1972 judgment, indicating that the case was dismissed with no objection from the Commonwealth. Renn renewed his motion for a directed verdict. The motion was denied.

4

During deliberations, the jury requested a transcript of Renn's interview with Det. Williams. No transcript existed so the jury asked to listen to the interview again. The trial court consulted with the Commonwealth and Renn's counsel, and the jury was permitted to listen to the interview again, in open court and on the record. The jury then acquitted Renn of all charges against Betty. In regard to Beverly, Renn was convicted of one count of incest, with the jury recommending a sentence of 21 years in prison; one count of rape of a child over twelve, with the jury recommending 20 years in prison; and three counts of indecent or immoral practices with another, with the jury recommending ten years in prison on each count. The jury recommended the sentences run consecutively. The trial court adopted the jury's recommendation and sentenced Renn to a total of 71 years in prison.

## II. ANALYSIS.

### A. The trial court erred in allowing the Commonwealth to utilize Renn's silence in his interview with Detective Williams.

#### 1. Fifth Amendment right against compelled self-incrimination.

The Fifth Amendment to the United States Constitution protects persons from being compelled to be a witness against themselves. Section 11 of the Kentucky Constitution also states that "the accused . . . cannot be compelled to give evidence against himself." These rights are further reinforced by *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny.

In *Miranda v. Arizona*, the United States Supreme Court stated:

> . . .the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to

5

secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

384 U.S. at 444. *Miranda*, and its holding, have become the backbone of our criminal justice jurisprudence. The pervasive reach of this case, however, should not be equated with simplicity. *Miranda* issues continue to perplex legal practitioners and the courts.

*Miranda* applies to situations demonstrating custodial interrogation. "Custodial interrogation has been defined as questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of freedom of action in any significant way." *Commonwealth v. Lucas*, 195 S.W.3d 403, 405 (Ky. 2006) (internal citations omitted). "In order to invoke the right to remain silent, a suspect must *clearly* articulate his desire in a manner that a reasonable police officer in the situation would understand that the suspect wished for questioning to cease." *Meskimen v. Commonwealth*, 435 S.W.3d 526, 531 (Ky. 2013) (emphasis in original). "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. *Miranda* does not apply to this case because Renn was not in custody when he voluntarily met with Det. Williams. We discuss *Miranda* only to point out that

because Renn was not subjected to a custodial interrogation, any assertion of his right to remain silent did not require Det. Williams to cease any questioning.

Independent of the requirements for *Miranda* warnings, a suspect has the right to be free from compelled self-incrimination as granted in the Fifth Amendment and applicable to the states through the Fourteenth Amendment. "The giving of a *Miranda* warning does not suddenly endow a defendant with a new constitutional right. The right to remain silent exists whether or not the warning has been or is ever given. The warning is required not to activate the right secured, but to enable citizens to knowingly exercise or waive it." *Green v. Commonwealth*, 815 S.W.2d 398, 400 (Ky. 1991). The invocation of the right to remain silent is not required to be formal. *Buster v. Commonwealth*, 364 S.W.3d 157, 162-63 (Ky. 2012). Even so, the assertion must be unequivocal. *Davis v. United States*, 512 U.S. 452, 461-62 (1994); *Ragland v. Commonwealth*, 191 S.W.3d 569, 586-87 (Ky. 2006).

A defendant can waive his or her right to remain silent. The waiver must be voluntary, meaning that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Bartley v. Commonwealth*, 445 S.W.3d 1, 13 (Ky. 2014) (internal citations omitted). "The basic governing legal rule is that a court, in considering whether a defendant has voluntarily relinquished his Fifth Amendment rights, must examine the 'totality of circumstances surrounding the interrogation'." *United States v. Ferrer-Cruz*, 899 F.2d 135, 141 (1st Cir. 1990) (internal citations omitted).

7

**2. It was error for the Commonwealth to use Renn's invocation of his right to remain silent in its case-in-chief.**

The Commonwealth argued, and the trial court agreed, that the prosecution could use a defendant's pre-arrest, pre-*Miranda* silence as substantive evidence of guilt based on holdings in *Salinas v. Texas*, 570 U.S. 178 (2013) and *Bartley v. Commonwealth*, 445 S.W.3d 1 (Ky. 2014). The Commonwealth's interpretation of these cases was flawed.

In *Salinas*, the United States Supreme Court addressed whether the Fifth Amendment prohibited the prosecution from commenting on the defendant's silence during non-custodial questioning. 570 U.S. at 184-86. Salinas voluntarily met with police and he was not read *Miranda* warnings. *Id.* at 182. He answered most of the officer's questions but sat in silence when asked questions about the murder scene. *Id.* Salinas resumed answering additional questions. *Id.* The plurality opinion held that the prosecutor's use of Salinas's silence was allowed, not because of the pre-arrest/pre-*Miranda* nature of the interview, but because Salinas did not unambiguously and affirmatively assert his right to remain silent. *Id.* at 186. "A witness does not expressly invoke the privilege by standing mute." *Id.* at 187.

In *Bartley*, this Court addressed several issues, including "whether the Commonwealth may introduce a criminal defendant's pre-arrest, post-*Miranda* silence as substantive evidence in its case-in-chief . . . whether a criminal defendant may selectively invoke his or her right to remain silent, and if so, under what circumstances will continued comment from an accused constitute

8

a waiver of a selective invocation of silence." 445 S.W.3d at 2. While *Bartley* is distinguishable in that Bartley received *Miranda* warnings, the case is particularly relevant regarding selective silence.

The Court discussed in-depth the other jurisdictions that have addressed selective silence and held that such silence is protected by the Fifth Amendment. Ultimately, the Court noted that "*Miranda* strongly suggested that the prohibition on using an accused's silence should apply to all situations where an accused remains mute in the face of police interrogations." *Id.* at 12 (citing *Miranda*, 384 U.S. at 468, n. 37). "While that does not apply to pre-arrest, pre-*Miranda*-warnings (**where the right to silence has not been invoked**) situations after *Salinas*, it is nonetheless a strong statement that silence should not be used against an accused." *Id.* (emphasis added). "Finally, the Court notes that there is a strong policy reason for providing all citizens, including those under investigation for a criminal offense, the right to turn to police when they believe they are in danger without sacrificing their right to silence and inviting police to have another bite at the interrogation apple." *Id.* Selective silence is a protected right. *See id.* at 12.

This Court also held that where a defendant invokes her right to remain silent, arising out of official compulsion, defendant's pre-arrest, pre-*Miranda* invocation of her Fifth Amendment right may not be used in the Commonwealth's case-in-chief. *Baumia v. Commonwealth*, 402 S.W.3d 530, 536 (Ky. 2013). The trial court seemed to conclude that since *Baumia* was decided before the United States Supreme Court decided *Salinas*, *Salinas*

9

controlled.[5] We reiterate our precedent and maintain that an accused's selective silence is protected and the Commonwealth may not use an accused's pre-arrest/pre-*Miranda* silence (when the right to remain silent is invoked) as substantive evidence of guilt.

Renn claims he made several statements in his interview with Det. Williams that invoked his right to silence. We group these assertions together and address each one in turn.

(1) Renn: Well, you know the old saying, keep your mouth shut if you can.

Det.: I understand that. But are you okay to talk?

Renn: I'm not going to make any statement on any of it.

Renn did not invoke his right to silence when he said, "Well, you know the old saying, keep your mouth shut if you can." As stated above, invocation of the right must be express and unequivocal. This statement is neither. However, Renn's second assertion, "I'm not going to make any statement on any of it," was express and unequivocal and clearly evidenced his desire to assert his privilege against self-incrimination.

(2) Renn: Just look at it this way. I may not be under arrest but should keep my mouth shut.

Det.: Like you said you definitely have a right to do what you want to do.

Renn: (laughs)

---

[5]*Baumia* was rendered on May 23, 2013 and *Salinas* was rendered on June 17, 2013.

10

Det.: I just, I just really wish I could understand you know why these allegations...

Renn: Because if this goes to court, somebody else is going to court too, not just me. I've got witnesses to some things that went on. So.

Det.: What type of things? Like I mean is it...

Renn: I ain't. I ain't saying that, I'm just saying I got witnesses.

These statements, likewise, did not make an express, unequivocal assertion of Renn's privilege. Not only does Renn not clearly state that he is going to remain silent, but he affirmatively responded to Det. Williams. Renn's laughter and statement about having witnesses if he goes to court were voluntary responses not indicative of one who wishes to remain silent. It is axiomatic that one who invokes his right to silence, must, in fact, remain silent.

(3) Det.: Is there anything . . . I know you don't want to make any statements but is there anything that you would like to say to me while I'm here? Outside of this like you may not get another opportunity to talk to me.

Renn: No. Just that uh... uh hell...just something is gonna has to goes up that's all. All anything I can do, as I said keep my mouth shut. I mean I may make a statement you think I'm guilty as hell or you might think the other way I don't know.

11

Det.: I'll be honest I don't have any thoughts as far as being guilty or not guilty. I'm just, you just kinda got me thrown off about coming down here and talking to me but...

Renn: I'm not saying anything.

In this exchange, Renn did not make a proper invocation of his right until his last statement. The interview lasted approximately thirty minutes and yielded two instances where Renn properly invoked his protections under the Fifth Amendment. Although Renn did not claim the privilege in every instance in which he argues he claimed the privilege, this Court holds that it was error for the Commonwealth to comment on these assertions in its case-in-chief. Consistent with *Salinas*, *Bartley*, and *Baumia*, Renn asserted his right to remain silent and the Commonwealth's commentary thereon was improper.

### 3. The error in admitting Renn's invocation of his right to remain silent was harmless beyond a reasonable doubt.

> A properly preserved constitutional error is reversible . . . unless it was "harmless beyond a reasonable doubt." The question is not simply whether there was sufficient evidence to support the conviction aside from the improper evidence. The question, rather, is whether the improper evidence was of a weight, was of a striking enough nature, or played a prominent enough role in the Commonwealth's case to raise a reasonable possibility that it contributed to the conviction.

*Staples v. Commonwealth*, 454 S.W.3d 803, 827 (Ky. 2014).

Renn's statement was played for the jury. The Assistant Commonwealth's Attorney commented on Renn's silence during closing argument. The jury requested to listen to the interview again during deliberations. Renn argues that these facts clearly show that the outcome of

12

his trial was influenced substantially by the playing of his taped interview and the Commonwealth's commentary thereon. We disagree.

We acknowledge that Renn's statement was played for the jury, the Commonwealth commented on Renn's silence, and the jury was permitted to re-listen to the interview during deliberations. These facts, however, do not support Renn's proposition that the silence contributed to the conviction. First, as discussed previously, Renn was not actually silent in his interview. He laughed in response to Det. Williams's question on whether any of the allegations took place, he talked about having a dream that the police would be contacting him, the dream did not make him feel anything, and the only thing he thought was to run. Renn's utterances of words normally indicative of invocation of the right to remain silent, without execution in the invocation of the right, do not suffice. Any inference the jury gleaned from the interview was properly provided to it.

Renn also argues that because the Commonwealth's only other evidence was the testimony of Betty and Beverly, the interview must have contributed to his conviction. Renn notes that the Commonwealth did not produce any physical evidence or other witnesses to corroborate the allegations of abuse. This is correct. However, Renn's trial occurred more than forty years after the allegations. It appears that no physical evidence was obtained in the 1972 case, so it logically would not appear in this case. Further, the clandestine nature of sexual abuse rarely, if ever, produces witnesses other than the victim.

Our case law has long recognized this undeniable truth.

> "Corroboration in a child sexual abuse case is required only if the unsupported testimony of the victim is '. . .contradictory, or incredible, or inherently improbable.' Otherwise, discrepancies in the victim's testimony are matters of credibility going to the weight to be given by the jury to the child's testimony."

*Garrett v. Commonwealth*, 48 S.W.3d 6, 10 (Ky. 2001) (internal citations omitted). "The testimony of even a single witness is sufficient to support a finding of guilt, even when other witnesses testified to the contrary if, after consideration of all of the evidence, the finder of fact assigns greater weight to that evidence." *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky. 2002) (citing *Murphy v. Sowders*, 801 F.2d 205 (6th Cir. 1986)).

We also note the innocuous nature of the use of Renn's invocation of silence. Renn's interview with Det. Williams lasted approximately thirty minutes. Despite Renn's argument that he repeatedly invoked his right to remain silent, there were two statements that adequately claimed the right; those statements comprised a negligible amount of time in the interview. Additionally, the Commonwealth did not make further comment on the silence until closing argument.

It is clear to this Court that Renn's conviction rested on the jury's credibility determinations. Renn was acquitted of all charges against Betty yet convicted of five charges against Beverly. Renn presented his own evidence, including his son's testimony that he was unaware of any abuse, and the deputy clerk's introduction of the 1972 judgment of dismissal. "It is the jury's responsibility to weigh the credibility of the evidence." *Miller v. Commonwealth,*

14

283 S.W.3d 690, 697 (Ky. 2009) (citing *Clement Brothers Construction Co. v. Moore*, 314 S.W.2d 526, 530 (Ky. 1958)). "[I]t has long been held that the trier of fact has the right to believe the evidence presented by one litigant in preference to another. The trier of fact may believe any witness in whole or in part. The trier of fact may also take into consideration all of the circumstances of the case. . . ." *Id.* at 699 (internal citations omitted). The jury found Beverly's testimony to be credible but was unable to find credibility and guilt beyond a reasonable doubt with regard to Betty's accusations. As such, this Court holds the jury made a proper credibility determination, entirely within its purview, and any error pertaining to Renn's statement to Det. Williams was harmless beyond a reasonable doubt.

## B. Any error during the Commonwealth's closing argument was not palpable.

Renn argues that the Assistant Commonwealth's Attorney committed several instances of flagrant misconduct during closing argument. "An appellate court may reverse for prosecutorial misconduct occurring during closing argument only if the misconduct is 'flagrant' or if: (1) the proof of guilt is not overwhelming, (2) an objection is made, and (3) the trial court failed to admonish the jury after sustaining the objection." *Mayo v. Commonwealth*, 322 S.W.3d 41, 55 (Ky. 2010) (citing *Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky. 2002)). Renn argues preservation of this issue based on his objection to the Commonwealth using Renn's silence in its case-in-chief. However, Renn did not object to the Commonwealth's comments during closing argument. As

such, we treat the argument as unpreserved. Because Renn requested palpable error review pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26, we review under that standard and no determination of flagrant misconduct is warranted.

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

RCr 10.26.

> A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis boils down to is whether the reviewing court believes there is a substantial possibility that the result in the case would have been different without the error. If not, the error cannot be palpable. Finally, when reviewing claims of prosecutorial misconduct, we must focus on the overall fairness of the trial and may reverse only if the prosecutorial misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings.

*Doneghy v. Commonwealth*, 410 S.W.3d 95, 106 (Ky. 2013).

Renn points to the Commonwealth's statements during closing argument about Renn's interview with Det. Williams. According to Renn, the Commonwealth repeatedly discussed Renn's declarations that he was not going to speak about the allegations and the Commonwealth urged the jury to consider Renn's statements that he was not going to answer questions related to the incidents as evidence of his guilt. The Commonwealth told the jury to consider the interview with Det. Williams, saying "Not once, not ever did he deny it. He never said I didn't do this. He just said, you know what, I'd rather

16

not talk about it." The Commonwealth also utilized a PowerPoint slide which stated: "NEVER DENIES IT" and "Said he wasn't going to talk about it."

As discussed above, it was error for the Commonwealth to comment on Renn's invocation of his right to remain silent. However, this comment does not rise to the level of palpable error. The Commonwealth's closing argument lasted approximately forty-nine minutes. The Commonwealth's comment on this statement comprised seventeen seconds of the total closing argument.[6] We cannot say that this error was so egregious to affect the fairness of the proceedings, therefore it is not palpable.

Next, the Commonwealth stated that Renn said he was "just gonna keep my mouth shut." The Commonwealth continued explaining that the jury could not hold the fact that Renn did not testify against him, but they could take into account the statements Renn did make to Det. Williams and judge his credibility the same way they would judge any other witness. We find no error here. Renn's statement that he should keep his mouth shut is not an express, unequivocal assertion of his Fifth Amendment right. Further, the Commonwealth was correct in telling the jury they could take into account the statements Renn did make and judge his credibility accordingly. The totality of the interview contained some arguably inculpable behavior from Renn, such as Renn's laughter after Det. Williams asked if any of these things ever took place, these things being the allegations of abuse. The jury was very much entitled to consider Renn's statements in making its credibility determinations.

---

[6] Statement began at VR 2/16/17, 1:56:04 and ended at 1:56:21.

17

Renn particularly argues that the Commonwealth mischaracterized a portion of his statement to Det. Williams. The interview indicates Renn stated, "I don't think there's anything I can do except, as I said, keep my mouth shut. I mean I may make a statement that I'm guilty as hell, or you might think the other way, I don't know." The Commonwealth referenced only the first part of this statement, "I may make a statement that I'm guilty as hell." This was also published on a PowerPoint slide.

Again, this statement does not invoke the right to avoid compelled self-incrimination, and the Commonwealth's commentary thereon is not palpable error.

Lastly, Renn claims error in the Commonwealth's discussion of the dismissal of the 1972 indictment. The jury heard testimony from Beverly that she spoke with the judge in chambers before the 1972 indictment was dismissed. The Commonwealth, in closing, stated that defense counsel "would have you believe that that's a fallacy that something like that would never have happened. But there have been times in the history of our judicial system in which judges have done the wrong thing because of personal connections."

Renn objected arguing that this statement went beyond any reasonable inference to be drawn from the evidence. The trial court overruled the objection, and the Commonwealth then stated:

> As I was saying. We know that the judicial system has evolved over the years. And [defense counsel] would have you believe that something like this never would have occurred. But judges have been reprimanded for having *ex parte* communications with parties without the other side present such that there had to be a Supreme Court case put in place to forbid such *ex parte* communications.

18

Renn maintains that it was misconduct for the Commonwealth to stress to the jury that such instances occur and to suggest that such could have occurred in 1972/1973.

"Counsel has wide latitude during closing arguments" and "may comment and make all legitimate inferences that can reasonably be drawn from the evidence presented at trial." *Mullins v. Commonwealth*, 350 S.W.3d 434, 439 (Ky. 2011) (internal citations omitted). Because of this latitude, the Court must consider closing arguments as a whole. *Id.* The Commonwealth can also respond to matters raised by the defense. *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky. 2005) (citing *Hunt v. Commonwealth*, 466 S.W.2d 957 (Ky. 1971)).

During the defense's closing, Renn's counsel stated that "judges do not have victims in their chambers and dismiss a case. The Commonwealth's attorney does not let a case with merit get dismissed because they don't want to press forward." Renn was clearly attacking the veracity of Beverly's statements about meeting with the judge in 1972/1973. The Commonwealth was likewise entitled to respond. The Commonwealths statements that judges have been reprimanded for *ex parte* communications was not misconduct. It was a true and legitimate inference in response to Renn's attack on Beverly.

The Commonwealth's statements about judges doing the wrong thing because of personal connections is more troublesome. While we do not believe the Commonwealth was insinuating that Renn had connections with the judge

in the 1972 case, or that the jury would gather that inference from the Commonwealth's statement, this clearly went beyond the scope of responding to Renn's attack on Beverly's credibility. Therefore, to that extent, we admonish the Commonwealth for its unverified inference regarding the integrity of the trial judge who originally presided over this matter.

Even so, we do not find the error to be palpable. We are hard-pressed to believe that the jury drew any unpermitted inferences from this statement. The statement lasted only seconds. The statement did not affect the fairness of Renn's trial in light of the evidence against him.

### III. CONCLUSION.

For the foregoing reasons, we hold that a defendant's pre-arrest, pre-Miranda silence cannot be used as substantive evidence of guilt. We hold that the error in the Commonwealth's use of Renn's silence was harmless beyond a reasonable doubt. We affirm the judgment of conviction of the Jefferson Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Daniel T. Goyette
Office of Louisville Metro Public Defender of Counsel

Cassandra Florence Kennedy
Office of Louisville Metro Public Defender

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Jesse Robbins
Assistant Attorney General